[No. B229324. Second Dist., Div. One. Dec. 5, 2011.]

MAURIZIO R., Plaintiff and Appellant, v.
L.C., Defendant and Respondent.

**COUNSEL**

Walzer & Melcher, Christopher C. Melcher and Jennifer L. Musika for Plaintiff and Appellant.

Phillips, Lerner & Lauzon, Peter A. Lauzon and Sharon Stark for Defendant Respondent.

**OPINION**

**JOHNSON, J.**—In this action brought under the Hague Convention on the Civil Aspects of International Child Abduction, October 25, 1980, T.I.A.S. No. 11670 (Hague Convention), as implemented by the International Child

Abduction Remedies Act, title 42 United States Code section 11601 et seq., a father appeals from a decision denying his petition for return of his young son, who was abducted by his estranged wife from Italy and brought to the United States. The trial court found that absent the satisfaction of certain conditions or "undertakings," return of the child to Italy unaccompanied by his mother would pose a grave risk to his psychological health. The father's petition for return was denied after he failed fully to satisfy each condition.

■ We conclude the evidentiary record is sufficient to support the trial court's factual findings as to the existence of a grave psychological risk. But the undertakings imposed by the court in an effort to ameliorate that risk to the child upon return are problematic. They impermissibly hinge on the abducting parent's cooperation, and require the father to fulfill a requirement that is beyond his control. We therefore reverse with instructions to grant father's petition and to fashion conditions of return to mitigate the risk of harm occasioned by the child's repatriation.

### FACTUAL AND PROCEDURAL BACKGROUND

Respondent L.C. (herein Mother) is a United States citizen. Her husband, petitioner and appellant, Maurizio R. (herein Father), is an Italian citizen who has always lived in Italy. The couple married in 2003 and settled in Parma, Italy. In August 2005, their son, Leonardo R. (Leo), was born in Italy. Apart from an extended family stay in Los Angeles in 2008 and 2009, Leo, who is a citizen of the United States and Italy, has always lived in Italy with both of his parents.

On February 16, 2010,[1] Mother took Leo and left Italy without Father's knowledge or consent. Mother told Father about their departure after the fact, sending him an e-mail from the airport stating that she and Leo would be staying with her mother in Los Angeles and would return to Parma in early March. Mother did not return to Italy. Instead, she filed for legal separation in the Los Angeles Superior Court seeking custody of Leo and monitored visitation for Father. In that action, Mother also requested and received a temporary restraining order against Father, and permission to take Leo to psychotherapy.

Back in Italy, Father filed or precipitated the filing of three legal proceedings. He filed a charge (lawsuit) which precipitated the Italian prosecutor's filing of a child abduction action against Mother under the Italian Criminal Code (art. 574), a crime carrying a potential sentence of up to three years in prison. Father also filed a petition to terminate Mother's parental rights, and a family law action seeking legal separation and custody of the couple's child.

---

[1] Unless otherwise noted, further date references will be to calendar year 2010.

In the United States, Father filed the instant petition for return of minor child under the Hague Convention (petition). The trial court appointed Terri Asanovich, L.C.S.W., an independent child custody evaluator, to "[d]etermine if alleged abuse of [Leo] or [Mother] by [Father] occurred and if so, whether return of [Leo] to Italy would pose a grave risk of physical or psychological harm to [Leo]."

An eight-day evidentiary hearing on the petition was conducted between July 27 and August 9. At the outset of the hearing, the parties stipulated that Italy was Leo's "habitual residence" at the time of his wrongful removal in February.[2] The action proceeded on the only matter at issue: whether Mother could establish, by clear and convincing evidence, that returning Leo to Italy would pose a grave risk of physical or psychological harm, or otherwise place the child in an intolerable situation. (Hague Convention, art. 13b; 42 U.S.C. § 11603(e)(2)(A); *Witherspoon, supra*, 155 Cal.App.4th at p. 974.)

*Mother's presentation of evidence*

*Mother*

Mother was the first witness. She testified that Father was very controlling. He required that Mother "obey him," demanded that she perform tasks the way he required, refused to permit her to work outside the home or to ask him for money, refused to let her get a driver's license for years or to use his car, and forbade her from sharing information about their personal life with friends or family. The family's apartment in Parma was cold and dark because Father imposed strict limits on the use of heat and lighting. He removed all interior doors in the apartment (except in the bathroom) in order to keep an eye on Mother. Father slept late into the day and insisted that Mother and Leo remain quiet while he did so.

Father was very critical of Mother and Leo. He criticized Mother's appearance and her sexual proficiency. He told her she was "damaged goods" and did not know how to love or deserve to be loved. Father regularly "would yell . . . for hours, until the point that [Mother] was crying and unable" to talk. Father's outbursts and criticisms of Mother often took place in front of Leo. Father frequently criticized Leo, calling him a "monello" (Italian for a "bad/naughty" boy). He made fun of his son for crying and told him he was fat. Once in front of their son, Father told Mother she could be Leo's "owner." Father sometimes remained silent and ignored Mother and Leo for days at a time.

---

[2] "Wrongful," meaning the child was removed without Father's consent and in violation of custody rights he was exercising at the time of the abduction. (*In re Marriage of Witherspoon* (2007) 155 Cal.App.4th 963, 972 [66 Cal.Rptr.3d 586] (*Witherspoon*).)

Father became extremely angry with Mother on several occasions. It happened once after Mother checked into the cost of a train ticket to visit her sister in Vienna without telling him. Father cornered her in the bathroom, threatening to "become like a beast." Mother was afraid and tried to leave the apartment, but Father physically prevented her from leaving. Another time, Father punched a cupboard next to Mother as he screamed at her in front of Leo. On another occasion, Father cornered Mother in the bathroom and threatened to "beat [her] because violence is the only thing that [she] underst[ood]." More than once, Father taunted Mother, trying to provoke her into hitting him. On one occasion, Father shoved Mother in the back after she went to bed during an argument. Father also pushed Mother on other unspecified occasions. Mother was afraid for her physical safety and for Leo's.[3] She also feared Father would follow through on threats to throw Mother and Leo out. In early February Mother went to an antiviolence center in Parma. The staff told her the situation at her home was "dangerous" for her and "particularly dangerous for Leo," and she "should get out . . . as soon as [she] could." Mother did not report Father's abuse to the police in Parma because Father said he had friends on the police force (some of whom she had met), and it was common knowledge the Italian police could be "bought."

Mother observed Father engage in sexually inappropriate behavior with Leo. When Leo was about one year old, Father allowed Leo to place his mouth on Father's penis. Father often stood naked in the bathroom, and Mother saw Leo touch Father's penis many times. She saw Leo put the vacuum cleaner on Father's uncovered penis several times. Father laughed, as though Leo's behavior was funny and cute, or otherwise shrugged off the behavior. Between June and November 2009, about once or twice each week, Mother observed Leo approach Father from behind. Leo spread the cheeks of his father's naked buttocks and tried to lick inside Father's buttocks. Father never told Leo to stop. Mother stopped Leo and pulled him out of the room. Father was sexually aroused by these incidents. Mother told Leo the touching was unacceptable and unsafe and asked Father to cover himself or to talk to Leo; he never did.

When Mother, Leo and Father were staying in Los Angeles in 2008 and 2009, Father insisted that Leo sleep in his own room in the dark with the door closed. Prior to this time, Leo, who was afraid of being alone in the dark, had used a night-light and had never slept behind a closed door. Six nights in a row, Father put Leo to bed, turned out the light, closed the door,

---

[3] Mother had heard Father threaten to kill people in the past, and Father threatened to shoot people in Leo's presence.

and held the door closed for over an hour while Leo banged on and kicked at the door, crying and begging to be let out. Father refused to allow Mother to intercede.

After the family returned to Italy in summer 2009, Leo began expressing negative sentiments about himself and engaging in self-injurious behavior. He said things such as "put me in the trash," "I belong in the street," and "I don't like myself." He punched himself "really hard" in the head and stomach, and banged his head on the floor and wall. Once, after Father awoke one afternoon, Leo hid from Father behind Mother in the bathroom. He said he was hiding "because [he] want[ed] to live." Leo tried to protect Mother from Father. In November 2009, Leo grabbed Father's screwdriver and moved toward Father carrying the tool like a knife, repeatedly saying "stay away from mommy," and blocking Father from entering the room Mother was in. Leo often told Mother not to worry and that he would protect her.

Leo's self-injurious behavior escalated after Father began visiting him in Los Angeles in April. After one visit, Leo told Mother he wanted "to die" and said he was "going to kill [him]self." He told Mother he had a "bad heart" and it was "because Daddy has a bad heart." He asked her to "push [him] out of the window," or "put [his] head in the garbage disposal and turn it on," and told Mother he was going downstairs to "get a knife" to "cut [him]self in two." Mother took Leo to the emergency room after that incident.

Father told Mother he had been severely depressed before they met and unable to leave the house or even get out of bed for a year. He suffered from depression, anxiety and sleep deprivation throughout their relationship, but refused to seek counseling. He did see psychiatrists to obtain medication and also took medicine prescribed for Leo's paternal grandmother, who has significant mental health issues of her own.[4] Father threatened to commit suicide in Leo's presence on more than one occasion. In addition to his mental health problems, Father suffers from numerous debilitating physical ailments.

Father was arrested and incarcerated for possession and trafficking of cocaine in 1990. He sold hashish and cocaine in Parma during 2009 and 2010 to make money. Mother saw Father use hashish during 2009. He told Mother he used cocaine too that year, but she did not see him do so. Mother used to drink about a bottle of wine per day in Italy, but did not drink in front of Leo, and also used marijuana. She had not used either substance since at least December 28, 2009, and was currently attending Alcoholics Anonymous.

---

[4] Father told Mother that Leo's paternal grandmother had recently been hospitalized for mental health problems, and had tried to commit suicide three times.

*The mental health experts*

Asanovich, the court-appointed evaluator, testified about the results of her evaluation and expanded on her written report. She reviewed various documents, including e-mails between Mother and Father, medical records, communications from attorneys and a file prepared by the Los Angeles County Department of Children and Family Services (DCFS) regarding its investigation of allegations of sexual and emotional abuse of Leo. She interviewed Leo, his parents, family friends, Leo's therapist and teachers, and Mother's therapist. As a result of her evaluation, Asanovich concluded "there is a grave risk to [Leo] if he were to be returned to Italy."

Asanovich feared that Leo's emotional state was so fragile that he might have a "breakdown," if returned to Father in Italy. There are a variety of causes of Leo's problems, which may stem from issues with both parents. For example, Father suffers from various physical and mental ailments, which negatively affect his ability to parent, and he is excessively critical of his wife and son. In addition, Mother admits to a history of alcohol abuse, a problem Asanovich believed Mother minimized. Asanovich had some concern about Mother's "enmeshment" with Leo, and the possibility she might be unable or unwilling to set boundaries for her son.

Asanovich met twice alone with Leo. He said he did not like or want to visit with Father. He said Father was only "pretending to be nice." He did not know why, but Father yelled at Mother and told Leo he was fat. When Asanovich asked Leo when he was going back to Italy, he said he wanted to stay in America forever. He also said, "I'm not going back to Italy. I don't want to. It's not safe there. My daddy is always yelling at my mom." Leo refused to identify even one good thing about Parma and, when asked what one thing he would change in Italy with his father, Leo told Asanovich he "didn't want [Father] to yell" at him. When asked what he would request if given three wishes, Leo said his first wish was " 'that daddy was dead,' " and that his second wish would be " 'that daddy—daddy is'—something" " 'a piece of garbage.' " He did not make a third wish. He told Asanovich " 'it was always cold in Parma. Dad said don't turn on the heater. Too cold in the winter, too cold to go outside. In the summer it's too hot.' " Leo said that, if he could take just one person with him in a rocket ship to the moon or to a desert island, he'd choose his "mommy." Asanovich expressed concern that Mother or her family might be causing "alienation" between Leo and Father, or that they might be discussing the case with him.

Mother's and Leo's therapists told Asanovich they believed Father sexually abused Leo. Asanovich reviewed medical records from Leo's trip to the emergency room stating he exhibited signs of posttraumatic stress disorder

(PTSD). The reports state that Leo told the ER doctor his father " 'made me touch his penis,' " and that he " 'licked [his] dad' " on the " 'bottom.' " Leo told Asanovich there had been "inappropriate contact" between him and his father, but she did not specify the nature of the contact. Leo did not think his father was affectionate enough; i.e., "didn't give him cuddles."[5]

It was clear to Asanovich that neither parent hit or physically abused Leo. But, when Asanovich met with Leo and Father together, she observed that "there was something definitely wrong" with Leo's affect during that meeting: "He was agitated, his body was stiff. He was having a hard time sitting down and interacting." Leo's "entire demeanor was very rigid, . . . [and] he seemed stressed." She also testified that Father was "guilting" Leo during the meeting by telling the child that he (Father) cried and missed him (Leo). Father also tried to manipulate Leo into being affectionate with him by telling his son his paternal grandparents missed him and that Father wanted to give Leo a kiss from them.

Asanovich reviewed medical reports prepared by Father's Italian doctors in November 2007, and January and February 2009. Based on those reports, she opined that, "from a clinical standpoint," Father lived in "a chronic state of anxiety and depression . . . that . . . imping[ed] on his functioning as an adult, as a spouse, and also as a father. . . ." Presented at the hearing with a more recent medical report, Asanovich acknowledged there was evidence Father had gained more "autonomy" since February 2009. Asanovich also reviewed a letter from Mother's counsel in Parma, stating she had been told by an unidentified individual that Father had asked that individual to do something illegal, and the attorney feared that Mother's and/or Leo's physical safety or lives might be in danger.

Asanovich made the following recommendations:

"1. Due to the letter from the Italian attorneys, there is a grave risk to [Mother] by [Father].

"2. Due to [Leo's] behaviors, issues regarding emotional abuse by [Father] cannot be ruled out at this time, and returning him to Italy would pose a grave risk of psychological harm to the minor child."

The trial court questioned Asanovich regarding the bases for her conclusions. Asanovich gave credence to the letter from Mother's attorney in Italy

---

[5] Mother's therapist and Leo's first therapist in Los Angeles had reported suspected emotional and sexual child abuse to DCFS. Asanovich reviewed DCFS's report investigating those allegations and, in the end, deferred to the agency's conclusion that the allegations of sexual abuse were unfounded. Accordingly, those allegations did not constitute a basis for her conclusion that returning to Italy posed a grave risk to Leo.

based on her understanding that an attorney could be disbarred for fabricating such a document. She also said that, because there was no way to know if the threats were legitimate, it was best to err on the side of caution. Asanovich told the trial court she would be less concerned if Leo were returned to Italy in Mother's custody, because "his mother would be available" to him.[6] She opined that, "right now [Leo] is so polarized against [Father] that I think he might have a breakdown. Actually, that's how he appeared when he was in the office." Asanovich was not able definitively to state that Leo's condition was due to emotional abuse, as opposed to alienation, and proposed that further investigation be done.

*Nan Radulovic, L.C.S.W.*

Radulovic is Leo's therapist. She has diagnosed Leo with childhood PTSD, a disorder developed in response to chronic exposure to severe and significant trauma.[7] Leo suffered from ongoing exposure to interpersonal trauma, such as domestic conflict, regular criticism from Father, being forced to stay alone in the dark at night while he cried for extended periods, and from being forced to lick his father's buttocks.

According to Radulovic, all of Leo's PTSD symptoms are directly "verbally . . . linked . . . to his father." At his first meeting with her in mid-May Leo told Radulovic, "I never want to go back to Parma. It's cold and dark and daddy is mean all the time. I don't ever want to see my daddy again, he is too mean." During a session in early June, he told Radulovic, "Daddy made me lick his butt. That's okay, right? Daddy calls me 'monello' all the time. That means I'm a bad boy in Italian." In July, Leo told Radulovic, "I don't ever want to see my daddy again or go back to Parma," and "I don't have a dad. I want my dad to be dead." At another session he told her, "the evaluator can't leave me alone with daddy because he will beat me up. My daddy is a really mean guy. I don't want to see my dad."

---

[6] Father had suggested that his parents might help care for Leo upon his return, but Asanovich had concerns about the ability of Leo's paternal grandparents to care for or assist in Leo's care in Italy. Father's parents were old and lived outside of Parma. Asanovich was also concerned about Leo's paternal grandmother's ability to care for Leo, due to her recent psychiatric hospitalization and Father's representation that his mother had accidentally overdosed.

[7] The symptoms Radulovic observed in Leo which met the established criteria for PTSD are (1) an inability to modulate, tolerate or recover from emotional states like fear, anger and shame, manifesting in prolonged tantrums, or extended periods of unstoppable crying; (2) persistent disturbance of sleep and eating patterns, specifically recurring around the fact that he might need to see his dad; (3) an impaired ability to describe his emotional embodied states; (4) a preoccupation with threat; (5) maladaptive and compulsive attempts to self-soothe; (6) reactive self-harm statements; (7) an intense preoccupation with the safety of loved ones; (8) a persistent negative sense of self, including self-loathing and a sense of worthlessness; and (9) an excessive need for intimate contact for safety and reassurance.

At least four times Leo told Radulovic he would "never" go back to Italy. Father screamed at his mommy a lot and was mean to her. Leo was afraid for Mother, and mad at Father for yelling at her. Leo told Radulovic about using a screwdriver to try to protect Mother. He said it was dark and cold in Parma, there were no lights and his dad slept a lot and he had to be quiet during the day. He sometimes hid from Father when he awoke because "I don't want daddy to see me. I want to live." He wanted to take baths in Parma but was not allowed to. He told Radulovic Father held the door so he could not get out of his room, and he went to bed crying some nights. Father called him fat, a theme that recurred in Leo's play therapy.

Leo told Radulovic he wanted to kill himself. He understood that meant he would be dead, i.e., not living anymore. He said he had a "bad heart," and he should be put in the trash, into the garbage disposal or thrown out of a window.

Radulovic's diagnosis of PTSD also derived from observing Leo's behaviors. She testified about his "avoidance of trauma triggers." That is, Leo did not like to talk about a lot of things; it upset him. He would separate himself by shutting down or running out of a room. He had night terrors, frightening dreams, engaged in agitated behavior and was hypersensitive to criticism or perceived criticism. If Leo thought he did something wrong, he had an extreme reaction and required a great deal of soothing. There was a trauma-specific repetitive theme of rescue and revenge in Leo's play therapy, which was common to PTSD. Leo's self-soothing behavior was also another symptom underlying his PTSD diagnosis: if he felt anxious he wrapped himself up in a special soft blanket.

Radulovic never heard Mother say anything negative about Father, nor had she seen any indication of parental alienation. Mother is a "really wonderful parent. She is emotionally supportive of Leo, sets appropriate boundaries for him and tries to structure and normalize his day-to-day life."

Based on her knowledge and experience of patients with PTSD, Radulovic said she "would be very concerned about [Leo's] safety towards himself." She said "suicidality would be a big concern" in light of the child's expressions of self-loathing and worthlessness, and his unequivocal statements that he would "never go back to Italy." Given Leo's age, developmental stage and minimal coping skills, Radulovic said she would be "really fearful for him." In her view, it "would be emotionally and psychologically extremely damaging" for Leo to be removed from Mother and returned to Italy. Radulovic recommended that Leo remain in Mother's physical custody in Los Angeles.

*Father's presentation of evidence*

*Visitation monitors, family acquaintances and Leo's teachers*

The monitors who had observed two visits each between Father and Leo in April and May in Los Angeles testified about their reports. At the outset of two visits, Leo was withdrawn from Father and reluctant to engage with or approach him, or hostile to Father and quite upset about leaving with him. Father was patient on each occasion. After a short time Leo warmed up and interacted well with Father, accepting and returning his affection. On some visits Leo told Father he "[did not] want to live with [him]" and was "never going back to Italy." On one occasion, Leo told Father he wanted him to visit him at his house (the maternal grandparents' house). The comment was not prompted. But another time, Leo told Father he could not come to that house. One monitor said Leo did not appear fearful of Father during the visits she observed.

Several witnesses claimed to have been family friends of Father and Mother while they lived in Italy. None of these witnesses saw Father engage in any abusive behavior toward Leo or Mother, nor were they aware that Father's behavior ever caused Mother to fear for her own or Leo's physical safety. One witness said Mother told her Father was "verbally aggressive" with her. The witnesses described Father's parental relationship with Leo in varied but positive ways, including, "serene," "calm" and "patient," and said he seemed like a "normal" parent who was "very affectionate" with and set appropriate boundaries for his son. These witnesses described Mother's parenting style in ways ranging from treating Leo like an "obsession or toy," to "calm and patient, but perhaps a little too attached," and "devoted" to her son. One witness saw Mother twice between June 2009 and February 2010; both times Mother seemed confused and had an odor of alcohol. Another witness, whose child attended the same preschool as Leo and who saw both of Leo's parents fairly frequently, never saw Mother drunk.

Neither teacher from the preschool class Leo attended prior to February 2010 ever saw any sign that Leo was physically abused. They described Leo as "calm" and never heard him express any suicidal or self-loathing thoughts. They never heard him say anything about wanting to hurt himself, or saw any sign he had tried to do so. Leo was always happy to see Father and never showed any fear of Father.

*Father*

Father was convicted of cocaine possession—but not trafficking or sell-ing—in 1990. That was his only conviction or criminal charge, other than a

detention and deportation by immigration authorities due to a problem with his visa or passport. He never sold drugs. He used marijuana in 2003 and 2004, but it was not illegal in Italy at the time. He had not used illegal drugs since Leo's birth.

Father acknowledged that Leo touched his penis a few times while he and his son were in the shower or bathroom together. He described the touching as an innocent situation involving a child curious about his own body and his father's body. It happened three or four times. After the first time, Father told Leo "don't touch mine. Touch your own." Once Leo tried to put the vacuum on Father's penis (through Father's underwear), but Father admonished him to stop immediately. Leo never licked Father's anus. Leo did approach Father from behind to give him hugs and would make a "farting" noise against Father's lower back.

Father never shoved Mother in the back, never hit or threatened to hit either his wife or son, and never threatened to throw his wife out of the house. He did not call Leo names or verbally abuse him. He did call Leo "monello," but it was a term Mother liked and described only minor naughty things. Discipline of Leo, which was rarely required, involved "time outs," or withdrawing a toy or privilege. Father never locked Leo in his bedroom. There was a short time during which, after reading a book about how to help one's child get to sleep, Father held the door of Leo's room so he could not get out (it had no latch). However, that lasted for less than two minutes at a time (on four or five occasions), and then Father would open the door, hug Leo and take him back to bed. Once Father physically prevented Mother from leaving the house. She had been drinking and wanted to take Leo to visit her sister in Vienna. Father refused to let her take Leo, but said Mother was free to go alone.

*Trial court ruling*

At the conclusion of the evidentiary hearing on the petition, the trial court found that Leo suffers from symptoms of PTSD, and it was "plain that this child has undergone, or suffered, or had experiences that have created in him a great deal of fear and anxiety about his father." Based primarily on the testimony and report of Asanovich and Radulovic's testimony, the court concluded Leo would be "very, very injured if he were turned over to his father's custody at this point—or if he were taken away from his mother's custody, let me put it that way." The court noted it "would not order this child returned to Italy in his father's custody."

The court also stated it would not find the "grave risk of harm" defense applicable in the event Leo returned to Italy with Mother. It found the

existing risk could be mitigated if certain obstacles were overcome and Mother was able to care for and retain custody of Leo "for a sufficient period of time for the Italian court to proceed to make whatever evaluation it deemed appropriate." In pertinent part, the court's order states:

"3. There is clear and convincing evidence that [Father] perpetrated domestic abuse against [Mother].

"4. There is clear and convincing evidence that [Leo] suffers from symptoms of [PTSD].

"5. There is clear and convincing evidence that there is a grave risk that returning [Leo] to Italy without [Mother] will expose [Leo] to psychological harm.

"6. [Leo] cannot be returned to Italy in [Father's] custody because [the child] has a great deal of fear and anxiety about [Father]. [Leo] also cannot be placed in his paternal grandfather's custody in Italy.

"7. In order to ameliorate the grave risk that returning [Leo] to Italy will expose him to psychological harm, [Father] bears the burden of proving to the satisfaction of this Court that:

"a. The criminal charges against [Mother] in Italy have been withdrawn or dismissed and [Mother] will not be under threat of being arrested or prosecuted if she returns to Italy;

"b. A Protective Order has been issued by the Italian Court protecting [Mother] from [Father] pending further custody proceedings in Italy;

"c. A custody Order has been entered by the Italian Court awarding [Mother] sole physical and legal custody of [Leo] with monitored visitation . . . to [Father], preferably by a therapeutic monitor, pending further custody proceedings in Italy;

"d. An Order from an Italian Court or a legally enforceable undertaking obliging [Father] to provide housing for [Mother] and [Leo] in Parma . . . , to pay for the living expenses of [Mother] and [Leo] in Parma . . . , and to pay for weekly therapy for [Leo] in Parma . . . , pending further custody proceedings in Italy."

Father was ordered to provide evidence by October 25 that all four mitigating conditions (identified in par. 7) had been accomplished. A hearing was set for October 29 to address whether Father had sufficiently ameliorated the risk of harm to permit the trial court to return Leo to Italy in Mother's custody.

In connection with the October 29 hearing, Father submitted a document entitled "Minutes of Lawsuit Remission" (Remission), from the public prosecutor's office in Parma stating that, on August 25, 2010, Father appeared before an officer of the investigative police stating "he wished to withdraw his Lawsuit filed on 3/08/2010 against Mother . . . ."[8] In response, Mother submitted a declaration from the attorney in Italy representing her in the criminal child abduction action. That declaration states the Remission is "not a dismissal of the case," and the child abduction action would remain pending until a "specific judicial decision dismissing the criminal charge against Mother has . . . been issued."

After reviewing the parties' submissions, the court noted it remained concerned as to "whether the legal effect of what [Father] did . . . remove[d] all threat of criminal prosecution from [Mother]." Father told the court he had done "what your honor asked. That's what we do in Italy. I can't do more than that. . . . I drop the charge." In response, the court said: "I really don't know that. If I were [Mother], I wouldn't get on a plane to Rome based on this." The court denied Father's request to continue the hearing to obtain evidence demonstrating the criminal charges had been dropped. The court denied the petition and issued temporary custody orders in the marital dissolution action granting Mother sole legal and physical custody.

## DISCUSSION

1. *Legal principles and standard of review*

■ The Hague Convention provides a mechanism for the prompt return of a child taken by one parent across international borders in violation of a

---

[8] Along with the Remission, Father also submitted orders obtained from the court in Parma granting Mother temporary physical custody of Leo. Those orders gave Father monitored visitation, required him temporarily to pay Mother and Leo's living expenses, and to pay for Leo's psychotherapy, and for half his school expenses and half of his uncovered healthcare expenses. The Parma court also issued a restraining order (not required by the trial court here), indicating its belief that such an order would "better protect the minor's interest," and reserved jurisdiction to make additional temporary orders to protect Leo as necessary "to fulfill the terms imposed by the [California trial court] for the minor's contingent return to Italy."

The record does not contain any evidence of an order from an Italian court or any agreement addressing the issue of housing in Italy for Mother and Leo pending further custody proceedings there, nor does any court document or agreement address Father's action in Italy seeking to terminate Mother's parental rights.

right of custody. (42 U.S.C. § 11601(b)(3)(B); *Abbott v. Abbott* (2010) 560 U.S. ___ [176 L.Ed.2d 789, 130 S.Ct. 1983].) "The Hague Convention seeks to deter parents from abducting their children across national borders by limiting the main incentive for international abduction—the forum shopping of custody disputes. [Citation.] A court that receives a petition under the Hague Convention may not resolve the question of who, as between the parents, is best suited to have custody of the child. [Citation.] With a few narrow exceptions, the court must return the abducted child to its country of habitual residence so that the courts of that country can determine custody." (*Cuellar v. Joyce* (9th Cir. 2010) 596 F.3d 505, 508–509 (*Cuellar*).) The sole function of an action under the Hague Convention is to determine if the abducted child should be returned to the country of the petitioning (complaining) parent. The action does not govern the merits of custody disputes; those issues must be decided in appropriate proceedings in the child's country of habitual residence. (*In re Marriage of Forrest and Eaddy* (2006) 144 Cal.App.4th 1202, 1211 [51 Cal.Rptr.3d 172] (*Forrest*), citing Hague Convention, arts. 16, 19; 42 U.S.C. § 11601(b)(4); *Friedrich v. Friedrich* (6th Cir. 1996) 78 F.3d 1060, 1063.) The issue of which placement is best for a child in the long run is not relevant. (*Nunez-Escudero v. Tice-Menley* (8th Cir. 1995) 58 F.3d 374, 377.)

█ A petitioner under the Hague Convention "bears the burden of proving the child's wrongful removal or retention by a preponderance of the evidence. (42 U.S.C.A. § 11603(e)(1).)" (*Forrest, supra,* 144 Cal.App.4th at p. 1211.) If the petitioner succeeds in showing a wrongful removal, the convention requires repatriation of the abducted child to its country of habitual residence in all but a few exceptional circumstances. (See 42 U.S.C. § 11601(a)(4); *Blondin v. Dubois* (2d Cir. 1999) 189 F.3d 240, 245–246 (*Blondin I*).) Exceptions to the Hague Convention must be narrowly interpreted "lest they swallow the rule of return." (*Asvesta v. Petroutsas* (9th Cir. 2009) 580 F.3d 1000, 1004 (*Asvesta*).) One exception is at issue here. Article 13b of the Hague Convention provides that return of a child need not be ordered if "there is a grave risk that [the child's] return would expose [him] to physical or psychological harm or otherwise place [him] in an intolerable situation." (See 42 U.S.C. § 11603(e)(2)(A).) The "grave risk" defense is narrow, and must be established by clear and convincing evidence. (*Witherspoon, supra,* 155 Cal.App.4th at p. 974.)

There is no consensus in California regarding whether the trial court's factual determinations in an action under the Hague Convention are reviewed for "clear error," under the federal standard, or "substantial evidence," under California law. (*Escobar v. Flores* (2010) 183 Cal.App.4th 737, 748 [107 Cal.Rptr.3d 596]; *Witherspoon, supra,* 155 Cal.App.4th at p. 971 [clear error]; *Forrest, supra,* 144 Cal.App.4th at p. 1213 [substantial evidence].) We need not resolve this issue; our conclusion would not vary under either standard.

Interpretation of the convention itself is a legal question, which we review de novo. (*Forrest, supra,* 144 Cal.App.4th at p. 1212; *Cuellar, supra,* 596 F.3d at p. 508.) A trial court's application of the convention to facts is reviewed de novo. (*Blondin v. Dubois* (2d Cir. 2001) 238 F.3d 153, 158 (*Blondin II*).)

It is uncontroverted that Leo is a habitual resident of Italy, and no one seriously disputes that Mother wrongfully removed the child from Italy.[9] Accordingly, Father established a prima facie case for return under the Hague Convention. The trial court withheld relief under the grave risk exception.

## 2. *Sufficient evidence supports the trial court's finding of a grave risk of harm*

Father argues on appeal that the trial court erred when it found Mother established that returning Leo to Italy posed a grave risk of psychological harm to the child. We conclude otherwise. The United States Supreme Court recently recognized that a mother might demonstrate "grave risk" to her own safety and, by doing so, establish that her "child too would suffer 'psychological harm' or be placed 'in an intolerable situation.' " (*Abbott v. Abbott, supra,* 560 U.S. at p. ___ [130 S.Ct at p. 1997].) As discussed below, however, we also conclude the court imposed impermissible conditions on the child's repatriation.

According to Leo's therapist, the child suffers from PTSD. Radulovic believes it would be "extremely damaging" to remove Leo from Mother and return him to Italy, and she would be "very concerned about his safety toward himself." The independent court-appointed evaluator was less emphatic but agreed that Leo exhibits symptoms of PTSD. The evaluator also concluded that "issues regarding emotional abuse by [Father] cannot be ruled out at this time, and that returning Leo to Italy [without his mother] would pose a grave risk of psychological harm to" the child. Asanovich fears Leo might suffer a "breakdown" if returned to Father's custody in Italy. Father did not present any expert testimony to controvert the testimony given or conclusions reached by either mental health professional.

The trial court relied entirely on the testimony and professional opinions of Asanovich and Radulovic to form its conclusion that Leo "cannot be returned to Italy in [Father's] custody because [he] has a great deal of fear and anxiety about" his father, and that "there is a grave risk that returning [Leo] to Italy without [Mother] will expose the . . . child to psychological harm." The court made no finding regarding the source of Leo's psychological harm, found no

---

[9] Mother's brief makes a passing reference to Father's "consent" to Leo's removal to the United States. There is no support in the record for this assertion—raised for the first time on appeal. In any event, the trial court found otherwise, and Mother did not appeal that ruling.

evidence of physical abuse and specifically found that Mother had failed to make the requisite evidentiary showing that Leo had been sexually abused. It did not mention the letter from Mother's Italian attorney regarding the alleged death threats upon which part of Asanovich's recommendation was based, from which we infer that it did not find the speculative statements in that missive credible. Courts are admonished to interpret the grave risk exception narrowly, lest it swallow the rule that children wrongfully removed be returned promptly. (See *Asvesta, supra,* 580 F.3d at pp. 1004–1005; 42 U.S.C. § 11601(a)(4).) This rule was designed to protect the interests of the country of habitual residence in determining custody disputes and to deter parents from forum shopping. (*Simcox v. Simcox* (6th Cir. 2007) 511 F.3d 594, 604 (*Simcox*).) "These purposes, however, must 'give[] way before the primary interest of any person in not being exposed to physical or psychological danger or being placed in an intolerable situation.' [Citation.]" (*Ibid.*)

There is no question that some level of domestic abuse may trigger the Hague Convention, article 13b exception. The "difficult question is at precisely what level will return expose the child to a 'grave risk' of harm or place the child in an 'intolerable situation'? There is no clear answer . . . ," but it is imperative that a showing be made that the risk posed to the child is grave, not merely serious. (*Simcox, supra,* 511 F.3d at p. 605, italics omitted; see *Danaipour v. McLarey* (1st Cir. 2002) 286 F.3d 1, 14; see also *Walsh v. Walsh* (1st Cir. 2000) 221 F.3d 204, 218 ["the harm must be a great deal more than minimal"].)

■ *Simcox* illustrated the distinction between grave and serious risk of harm by articulating three broad categories into which abusive situations might fall. At one end of the spectrum are the cases in which the abuse is "relatively minor." (*Simcox, supra,* 511 F.3d at p. 607.) For example, one court held that two incidents of a mother striking her children, coupled with a chaotic home environment, failed to establish a "sustained pattern of physical abuse." (*McManus v. McManus* (D.C.Mass. 2005) 354 F.Supp.2d 62, 69–70.) In *Whallon v. Lynn* (1st Cir. 2000) 230 F.3d 450, the court held that a husband's verbal abuse and one incident in which he shoved his wife were insufficient to establish a grave risk of harm to the child. (*Id.* at p. 460.) Abusive situations are less likely to be considered "grave" where the allegations involve "isolated or sporadic incidents" of abuse. (*Simcox, supra,* 511 F.3d at p. 608.)

The opposite end of the spectrum involves cases in which "the risk of harm is clearly grave, such as where there is credible evidence of sexual abuse, other similarly grave physical or psychological abuse, death threats, or serious neglect." (*Simcox, supra,* 511 F.3d at pp. 607–608.) Examples of such cases include *Van De Sande v. Van De Sande* (7th Cir. 2005) 431 F.3d 567,

570, in which the court reversed a return order where a petitioner had repeatedly and severely beaten his wife in the children's presence and threatened to kill them; *Walsh, supra*, 221 F.3d at pages 219–220, in which an order of return was reversed after the court found a father was "psychological[ly] abus[ive]" and had severely beaten his wife in their children's presence; and *Rodriguez v. Rodriguez* (D.C.Md. 1999) 33 F.Supp.2d 456, 459–460, in which the court refused return where the child had been belt whipped, punched and kicked, and the child's mother was choked and her nose had been broken in physical attacks.

The remaining, and most difficult, category of cases "fall somewhere in the middle." In those cases, the abuse is "substantially more than minor, but is less obviously intolerable." (*Simcox, supra*, 511 F.3d at p. 608.) The grave risk analysis in such situations is "a fact-intensive inquiry that depends on careful consideration of several factors, including the nature and frequency of the abuse, the likelihood of its recurrence, and whether there are any enforceable undertakings that would sufficiently ameliorate the risk of harm to the child caused by its return." (*Ibid.*) The *Simcox* court observed that "although the 'grave risk' threshold is necessarily a high one, there is a danger of making the threshold so insurmountable that district courts will be unable to exercise any discretion in all but the most egregious cases of abuse." (*Ibid.*) When evaluating the allegations, trial courts must consider the totality of circumstances related to the alleged abuse, and resist the temptation simply to consider and explain away individual allegations in isolation. (See *In re Application of Adan* (3d Cir. 2006) 437 F.3d 381, 398.) The *Simcox* case fell into this middle group, and posed "a close question" arising from "difficult, middle-of-the-road facts." (*Simcox, supra*, 511 F.3d at p. 609.) There, the evidence portrayed the petitioner as "verbally and physically violent with his wife and children." (*Id.* at p. 599.) The children had witnessed numerous instances where their father struck their mother and "recounted frequent episodes of belt-whipping, spanking, hitting, yelling and screaming, and of [the father] pulling [the children's] hair and ears." (*Ibid.*) After concluding the alleged abuse was "serious" in nature, had occurred with "extreme frequency," and was likely to "occur again absent sufficient protection," the court found a grave risk of harm was established. (*Id.* at p. 609.)

Father argues this case falls into or below the category of cases constituting relatively minor abuse. He insists the order denying his petition must be reversed because mere "emotional abuse against a parent, in the absence of violence against the child or against the parent in the presence of the child" cannot, as a matter of law, "satisfy the grave risk exception." The question is very close. We conclude, however, that the court did not err by finding Mother made the requisite evidentiary showing.

The trial court, like its appointed evaluator, was unable to determine ("make a finding" regarding) the source of the psychological harm inflicted on Leo. Nevertheless, the court found clear evidence that Leo is a "very damaged" child who will suffer significantly if removed from Mother and returned to Italy. In other words, regardless of the source of the child's trauma, it was apparent to the only mental health experts who testified and to the court, that it would be extremely dangerous, emotionally and psychologically—and possibly life-threatening—to return Leo alone to Father in Italy. The record contains sufficient evidence to support that conclusion. Particularly so because Father failed to present any evidence to controvert the experts' opinions that Leo would suffer extreme injury if returned to his father's sole care in Italy.

The *Blondin* case is instructive in this regard. In *Blondin*, the father was physically and emotionally abusive to his wife and children and threatened to kill the mother and one child when the family lived in France. The mother and children lived in shelters at times, but the parents reconciled and the father resumed his abuse. Eventually, the mother abducted the children and brought them to the United States. (*Blondin II, supra,* 238 F.3d at pp. 155–156. The father sought return of the children under the Hague Convention. (238 F.3d at p. 156.) The district court found the mother established that return of the children presented a grave risk, and denied the petition. (*Ibid.*) In an initial appeal in the matter, the appellate court had no quarrel with the district court's decision not to repatriate the children under circumstances that "for lack of another alternative . . . might force them and [the mother] to live with [the father]." (*Ibid.*) Nevertheless, the court vacated the judgment and returned the matter to the district court with instructions to explore ways to try to "mitigate the risk of harm to the children, thereby enabling them safely to return to France." (*Ibid.*)

On remand, the father proposed arrangements he and the French authorities were willing to make to facilitate the children's return. (*Blondin II, supra,* 238 F.3d at pp. 158–160.) But, a mental health expert opined that, if the children were to be returned to France *under any conditions*, with or without their mother, " 'they would almost certainly suffer a recurrence of their . . . [PTSD] that would impair their physical, emotional, intellectual and social development,' " and " 'set them back in a very harmful way . . . .' " (*Id.* at p. 160.) The father failed to present any evidence about the psychological impact repatriation would have on his children. (*Ibid.*) Based on the evidence of the severe psychological impact of return on the children, the trial court deemed the father's evidence about arrangements he and the government were willing to make essentially irrelevant. Even with those arrangements in place, the children faced a virtually insurmountable obstacle because they associated France with their father's abuse and the trauma they suffered as a result. (*Id.* at p. 161.) Based on the expert's testimony and report, the district

court found that returning the children to France—under any arrangement—posed a "grave risk" to the children or would place them in an "intolerable situation." The court also found there was "nothing the French authorities could do to protect the children from the harm they face[d] in this particular situation, because their mere presence in France, the site of their trauma, would create the risk." (*Id.* at p. 161.)

The appellate court affirmed. It observed that it was "presented with a rare situation in which, for unexplained reasons, no evidence was presented by one party that would contradict the conclusions of an expert procured by the opposing party. [The expert's] conclusions thus stand uncontroverted. They are the only evidence that we and the District Court have available as to whether repatriation to France would cause the children to suffer a recurrence of traumatic stress disorder." (*Blondin II, supra*, 238 F.3d at p. 160.) The court emphasized that in "the absence of any contravening evidence on point, we see no basis upon which to question the District Court's finding that the children will suffer from a recurrence of traumatic stress disorder if they return to France." (*Id.* at p. 161.)

Here, as the trial court observed, the domestic abuse of Mother and trauma suffered by Leo falls far short of the abuse in *Blondin*. But, as in *Blondin*, we are faced with a record in which the evidence and opinions offered by mental health experts stands uncontroverted. Whatever the source of Leo's PTSD, in the shared professional opinions of an independent evaluator and Leo's therapist, the child's psyche "might not be able to withstand going back to Italy at this point" if forced to return without Mother, and he would likely suffer "imminent" harm to such an extent that the now six-year-old child might take his own life. The trial court found this evidence compelling.

On the record presented there is adequate evidence to support the finding that an order returning Leo to Italy without Mother would pose a grave risk to the child. But, as the trial court properly recognized, the inquiry does not stop here. The court must also consider whether any alternative remedies could facilitate Leo's repatriation and mitigate the risk of severe psychological harm. (*Blondin II, supra*, 238 F.3d at pp. 156, 158–163.) The trial court's analysis faltered at this step.

3. *Imposition of conditions designed to mitigate the risk of harm posed by repatriation*

Prompt but safe return of an abducted child to his or her country of habitual residence is always the overriding goal in an action under the Hague Convention. Even when confronted with a grave risk of harm, courts have discretion to " 'return [the] child to the country of habitual residence,

provided sufficient protection [is] afforded.' [Citation.] That protection may take the form of 'undertakings,' or enforceable conditions of return designed to mitigate the risk of harm occasioned by the child's repatriation." (*Simcox, supra,* 511 F.3d at p. 605.) "The determination of whether any valid undertakings are possible in a particular case is 'inherently fact-bound' and the petitioner proffering the undertaking bears the burden of proof." (*Id.* at p. 606, citing *Danaipour v. McLarey, supra,* 286 F.3d at pp. 21, 26.) Courts, commentators and the State Department have recognized the utility of undertakings of limited scope that can both accommodate an interest in the child's welfare, and further the Hague Convention's goal of promptly returning the child to his or her country of habitual residence. (See *Simcox, supra,* 511 F.3d at pp. 604–610.) Generally speaking, " 'undertakings are most effective when the goal is to preserve the status quo of the parties prior to the wrongful removal. . . .' [Citation.]" (*Id.* at p. 607.)

The trial court found there would be no grave risk of psychological harm to Leo if he returned to Italy with Mother and remained in her care pending custody proceedings there. It fashioned specific conditions designed to facilitate Leo's return. Father argues that in doing so, the trial court abandoned its role under the Hague Convention and engaged in a "best interests" analysis. We read the record differently. Applying the framework above, we believe the trial court attempted to craft undertakings to "ameliorate [the] risk of harm"—by returning Leo to Parma with both parents near (i.e., in an effort to restore the status quo prior to removal to the extent it was feasible to do so), under conditions designed to inflict as little trauma as possible. (See *Simcox, supra,* 511 F.3d at p. 610 [acknowledging trial court's attempt to balance the purpose of the Hague Convention with the children's safety by fashioning undertakings to protect the children from father's abuse during pendency of custody action].)

The trial court made a laudable effort to resolve the difficult dilemma with which it was faced. But the undertakings upon which it conditioned Leo's return pose two insurmountable problems: (1) their implementation is dependent on Mother's cooperation, thereby allowing her to thwart them should she choose to do so, and (2) they require Father to deliver something beyond his control.

### a. *Conditions for return cannot be contingent on Mother's cooperation*

The conditions fashioned by the trial court for Leo's return impermissibly hinge on Mother's cooperation. Again, *Simcox* is instructive. In *Simcox,* a mother took her children and fled a physically and verbally abusive husband. The children's father sought their return to Mexico under the Hague Convention. The trial court found the mother failed to establish the grave risk

defense, and ordered the children returned to Mexico for a custody determination. But the court conditioned the children's return on several undertakings, one of which required the children to " 'remain in the custody of [the mother] in the family's residence in . . . Mexico,' " until the foreign court determined custody and visitation. (*Simcox, supra,* 511 F.3d at p. 601.) The appellate court found that undertaking unenforceable because the mother "could arguably defeat the order of return by simply refusing to accompany her children to Mexico." If the mother chose not to return, "the condition that the children 'remain in [her] custody' would be unfulfilled, the children would not be returned," and further litigation would inevitably ensue. (*Id.* at p. 610; see also *Fabri v. Pritikin-Fabri* (N.D.Ill. 2001) 221 F.Supp.2d 859, 873 [declining to reach the issue of whether the Hague Convention violated the constitutional right to travel because "the court will not order that [respondent] herself return to Italy," only that the child must return, and providing for a contingency in the event the mother chose not to accompany her daughter to Italy].)

This case is substantially similar. Although the trial court did not order Mother to return to Italy, its undertakings were clearly premised on the notion that Mother would accompany her son on *his* court-ordered return to Parma once Father satisfied the conditions making it safe for her to do so. By fashioning the undertakings in this way, however, the trial court created a construct that impermissibly would allow Mother to use her refusal to return to Italy as a tool to enable her to keep Leo in Los Angeles by arguing the child cannot be returned to Italy without her.

█ Trial courts must be mindful not to craft undertakings so broadly as to allow the abducting parent to gain significant advantages from the abduction. To paraphrase their conclusions, both mental health experts here opined that Leo's fragile psychological health and sense of security is dependent on his ability to remain in Mother's care. But neither the fact that Leo is closely bonded to Mother, nor the fact that he has grown comfortable in Los Angeles, is a legitimate reason to deny the petition. Consideration of a child's bond with the abducting parent or his sense of security in new surroundings are not valid bases for departing from the Hague Convention's fundamental rule of return. The effect of return on a parent-child bond is a "determination pertinent only to the merits of the underlying custody dispute which must be resolved . . . [by] the courts of the child's habitual residence." (*Asvesta, supra,* 580 F.3d at pp. 1020–1021 [separating toddler from mother who was the abducting parent was not in and of itself a "grave risk"]; cf. *Diorinou v. Mezitis* (2d Cir. 2001) 237 F.3d 133, 145 [effect on child of separation from abducting parent is a consideration for court determining custody]; see *Friedrich, supra,* 78 F.3d at p. 1068 [abducting parent may not argue that child has become accustomed to new surroundings to defeat return].) Any different conclusion would permit an abductor to manipulate the judicial

process in order to defeat return. To interpret the Hague Convention in such a way as to defeat return would be tantamount to rewarding the parent for abducting the child. (*Cuellar, supra,* 596 F.3d at p. 512.)

Mother wrongfully removed Leo from Italy. By doing so she denied her son contact with his father and forced Father to go to extraordinary lengths to seek his lawful return. No parent should be rewarded for wrongfully abducting a child. But we cannot ignore compelling evidence that unconditionally returning Leo to Italy without Mother would pose a grave risk of harm to the child. Where, as here, the trial court has determined, based on uncontradicted and compelling evidence, that an unconditional return would pose a grave psychological danger for a child, the court would be remiss not to consider the harm to the child that would be caused by removing him. Nevertheless, in this case, under the Hague Convention, there is no question that Leo must be returned to Italy for custody proceedings. The only issue is how his return can be accomplished with a minimum amount of harm to the child.

The conclusion is unavoidable. Mother cannot be compelled to return to Italy. But her return with Leo is the option that the trial court recognized as the most efficacious. It is also the result that comports most closely with the mandates of the Hague Convention, the conclusions of the court-appointed evaluator and the recommendations of Leo's therapist. Nevertheless, if Mother refuses to return, her refusal cannot be permitted to defeat the Hague Convention.

Leo must be returned to Italy. And based upon statements made by respondent's counsel at oral argument, we expect that Mother will return to Italy when the trial court orders Leo's return. The challenge for the trial court on remand will be to craft undertakings—which do not *require* Mother's cooperation—"to ensure that a potential harm does not manifest when [Leo] returns to his . . . country of habitual residence." (See *Krefter v. Wills* (D.C.Ma. 2009) 623 F.Supp.2d 125, 138; *Feder v. Evans-Feder* (3d Cir. 1995) 63 F.3d 217, 226; *Kufner v. Kufner* (D.R.I. 2007) 480 F.Supp.2d 491, 515, fn. 34.) We are confident the trial court can fashion such undertakings, and that the courts in Italy are fully able to make arrangements to protect Leo's mental health pending the outcome of custody proceedings there. Indeed, by issuing a stay away order and retaining jurisdiction to make additional orders necessary, the Italian family court has already demonstrated its willingness and likely ability to protect the child pending custody proceedings there.

In the event that Mother decides not to return to Italy with Leo the trial court shall appoint a guardian or a "child welfare escort" (our term), to escort Leo back to Italy for further custody proceedings there. Once Leo has been presented to appropriate Italian authorities, the work and responsibility of the

California courts shall be completed. We must at all times be cognizant that just as there are California governmental agencies with expertise in addressing the needs of at risk children, so too there are agencies in the Italian government fully capable of addressing such needs. The fact that Leo might suffer severe stress and anxiety based on separation from Mother makes him no different from many children in similar positions vis-à-vis one parent or another in our own state, where an international abduction was not the trigger.

In those cases, we look to the courts and agencies like DCFS to provide the child with the counseling, support, and environment to ensure that potential psychological harms are averted. Likewise, we must acknowledge that the Italian government has the same capacity to address the needs, physical and psychological, of children under its jurisdiction. We remain hopeful that Mother will choose to accompany Leo and take whatever steps necessary to maintain and facilitate her son's mental health while the issue of custody is being resolved by the Italian courts.

Mother's willingness to return to Italy has appeared somewhat inconsistent so far. On one hand, she has shown resistance to returning to Italy. She fears she may still be subject to criminal prosecution and also that the courts in Italy may not treat her fairly (based on her interpretation of an Oct. 2010 order of the court in Parma that she has appealed). But the record contains no evidence to justify a conclusion that the Italian courts will be unfair to Mother. She also fears she will be ostracized in Parma, wants to maintain the financial security of her job and the support of family and friends in Los Angeles. None of these concerns justifies a court's refusal to order return. Mother is also worried about whether she or Father will be able to shoulder Leo's living, health care and school expenses in Italy. This concern is legitimate. Nevertheless, the court expects that Father will provide Mother and the trial court appropriate assurances that financial concerns will be addressed.

On the other hand, it appears Mother's position may have changed. During oral argument in this appellate action the court posed a hypothetical to Mother's counsel asking, if Mother wanted to retain custody of Leo and it was necessary for her to return to Italy to achieve that goal, whether the court was correct to "assume she'd go back to Italy under those circumstances?" Mother's attorney said he "believ[ed]" she would.

b. *Whether Mother is subject to prosecution in Italy is beyond Father's control*

The second troubling aspect of the trial court's undertakings is the requirement that Father prove that the "criminal charges against [Mother] in

Italy have been withdrawn or dismissed and [she] will not be under threat of being arrested or prosecuted if she returns to Italy." In an effort to satisfy this condition, Father submitted the Remission, indicating he had informed the prosecutor in Parma of his desire to withdraw the "lawsuit" against Mother which precipitated the filing of criminal charges for child abduction against her. The trial court found that effort insufficient. The problem with the condition imposed by the court is that it requires Father to provide the court with an assurance that is beyond his power to deliver.

Whether Mother remains subject to prosecution in Italy for the crime of child abduction is a decision within the discretion of the Italian prosecutors and courts, enforcing Italian law; it is not within Father's control. It is also not a defense to the return of Leo under the Hague Convention, which involves only the civil aspects of Leo's abduction.

A parallel issue arose in *U.S. v. Ventre* (9th Cir. 2003) 338 F.3d 1047, certiorari denied 540 U.S. 1085 [157 L.Ed.2d 763, 124 S.Ct. 951]. There, an Italian citizen took his child to Italy in violation of a custody order. The mother, a United States citizen, successfully petitioned in Italy for the child's return under the Hague Convention. (338 F.3d at pp. 1048, 1051.) After he returned to the United States with the child, a grand jury indicted the father for kidnapping in violation of the International Parental Kidnapping Crime Act of 1993 (IPKCA; 18 U.S.C. § 1204). The father moved unsuccessfully to dismiss the indictment, arguing that successful use of the Hague Convention to regain the child deprived the court of jurisdiction to convict him of kidnapping under IPKCA. (338 F.3d at p. 1050.)

The Ninth Circuit affirmed. It found that "IPKCA criminalizes the removal of a child to another country with the intent to obstruct parental rights," and punishes a parent for taking a child out of the United States to another country. But the Hague Convention "is a civil remedy adopted to effect the return of children brought to other countries." (*Ventre, supra,* 338 F.3d at p. 1052, italics omitted.) Its dual purposes are to secure the prompt return of children wrongfully removed or retained, and to ensure that the custody laws of signatory entities are accorded mutual respect. (*Ibid.*) IPKCA was meant to complement the Hague Convention, not replace it. (338 F.3d at p. 1053.) Accordingly, "neither the Convention nor the IPCKA prohibits criminal prosecution of an individual once a child is returned pursuant to Hague proceedings." (*Id.* at p. 1054.)

"[P]roceedings under the Hague Convention should be the 'first choice of a parent whose child has been abducted.' [Citations.] That does not, however, preclude prosecution of the kidnapper." (*U.S. v. Ventre, supra*, 338 F.3d at pp. 1053–1054.) The trial court overstepped its bounds by making an order for Leo's return contingent on Father's provision of an assurance from the Italian government that it will not arrest or prosecute Mother. We also note that, although it does not appear to have caused any difficulties to date here with the Italian courts, it bears mention that conditioning a return order on a foreign court's entry of an order may raise comity concerns. (See *Danaipour v. McLarey, supra*, 286 F.3d at p. 23, citing memorandum stating the Department of State " 'does not support conditioning the issuance of a return order on the acquisition of [an] order from a court in the requesting state,' presumably because such a practice would smack of coercion of the foreign court"].)

### 4. *Requirements on remand*

In an effort to regain contact with and custody of his son, Father agreed to the undertakings imposed by the trial court, and appears to have made a good faith effort to ensure those conditions were fulfilled. He has obtained orders from the Italian family court which appear to satisfy most of the trial court's concerns. He has also formally requested that the criminal child abduction charge be withdrawn by the Italian prosecutors.

On remand, we direct the trial court to grant Father's petition and fashion conditions of return to mitigate the risk of harm occasioned by the child's repatriation. Any order on remand should be explicit as to the appropriate conditions that will apply in the event Mother declines to accompany Leo upon his return to Italy, such as the appointment of a guardian or suitable escort for the child.

## DISPOSITION

The order denying the petition is reversed and the matter is remanded with instructions to grant the petition and fashion conditions to mitigate the risk of harm occasioned by the child's repatriation. The court is further instructed to order that Leo be returned to Italy as soon as is reasonably practicable, not to exceed 60 days from the date of this remand, with or without his Mother. In

the event Mother declines to accompany her son to Italy, he shall be returned there with a guardian appointed by the court.

The parties shall bear their own costs on appeal.

Mallano, P. J., and Chaney, J., concurred.

A petition for a rehearing was denied December 29, 2011, and respondent's petition for review by the Supreme Court was denied March 28, 2012, S199410. Kennard, J., was of the opinion that the petition should be granted.