[No. G037889. Fourth Dist., Div. Three. Sept. 27, 2007.]

In re the Marriage of DANNY and JULIE WITHERSPOON.
DANNY WITHERSPOON, Appellant, v.
JULIE WITHERSPOON, Respondent.

Counsel

Danny Witherspoon, in pro. per., for Appellant.

Gassner & Gassner and Stephen I. Gassner for Respondent.

Opinion

**ARONSON, J.**—Danny Witherspoon challenges the trial court's order (a) requiring the return to Germany of his two children from his marriage with Julie Witherspoon under the Hague Convention on the Civil Aspects of International Child Abduction, October 25 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 49 (reprinted at 51 Fed.Reg. 10494 (Mar. 26, 1986)) (Convention),[1] (b) declaring California an inconvenient forum for adjudicating their custody dispute, and (c) awarding Julie[2] temporary custody of the children pending their return to Germany. We conclude the trial court erred in failing to make factual findings regarding certain enumerated exceptions to the children's return under the Convention, and in awarding temporary custody of the children to Julie without considering whether doing so would pose a substantial risk of harm to them. We therefore reverse the order and remand for further proceedings.

---

[1] We grant Julie's request that we judicially notice the Convention.

[2] We refer to the parties by their first names for clarity and ease of reference, and intend no disrespect. (See *In re Marriage of Olsen* (1994) 24 Cal.App.4th 1702, 1704, fn. 1 [30 Cal.Rptr.2d 306].)

## I

### FACTUAL AND PROCEDURAL BACKGROUND

Danny was a high school band teacher in California when he began a sexual relationship with 16-year-old Julie, one of his students.[3] When rumors regarding Danny's sexual involvement with students surfaced, Julie, who was still 16 years old, moved with Danny to Florida where they lived together. In February 1994, the pair traveled to Las Vegas where Julie, then 17, married[4] Danny, at the time 52 years old. The couple's daughter was born in September 1994, and a son was born in June 1996.

In 1995, the couple moved to Garden Grove, California, where Danny again worked as a band teacher.[5] In 1997, Julie joined the Army Reserve and later requested and received active duty orders. In August 1998, Julie left Danny and moved to Fort Hood, Texas, with her children. In December 2002, Julie was deployed to Germany, and her children followed one month later. The children attended school in Germany from January 2003 until the end of July 2006. In June 2003, Julie was transferred to Iraq, and returned to Germany in August 2004. During her Iraq deployment, Julie left the children in the care of a childcare provider, assertedly because Danny refused to take them.

In July 2006, the children were hospitalized due to gastric problems. When Julie arrived to take the children home, the attending physician refused to release them because Julie was extremely intoxicated, hostile, and behaving in a bizarre fashion. According to social workers investigating the matter in Germany, Julie threatened to harm both the children and herself. As a result, the Army Community Service offices and the Jugendamt (Youth Welfare Office) took custody of the children, and Julie was involuntarily committed to a mental institution for a brief period.

Julie's commanding officer then contacted Danny and informed him the children had been placed in a foster home because the Jugendamt would not release them to Julie. The officer informed Danny the Jugendamt would release the children to him if he went to Germany. According to Danny, Julie also called him and told him to come to Germany to pick up the children because they were in foster care and she was restricted to barracks. Danny traveled to Germany and, after speaking with those involved, returned to the

---

[3] According to Julie, Danny began making "flirtatious advances" to her when she was 14 years old. Julie also notes she was a "special education" student.

[4] Danny's petition reflects a marriage date in 1995, but Julie asserts the parties were married in 1994. Both place the birth of their first child in 1994.

[5] Danny is currently the band director for Valley High School in Santa Ana, California.

United States. The children were sent to Danny shortly thereafter and, commencing in early August 2006, resided with him in Orange County.

On August 8, 2006, Danny filed for divorce in Orange County Superior Court, seeking sole legal and physical custody of the children, and requested an order denying Julie visitation absent treatment for alleged alcoholism and mental health problems. Danny included with his petition documents he received from the Army's Social Work Services Department and the Jugendamt detailing both the present and past abuse and neglect allegations relating to the children.

These documents included the following information. At some time before Julie's deployment to Iraq, social workers substantiated allegations of "mild emotional abuse and mild neglect of both children" by Julie. In December 2003, while Julie was in Iraq, social workers opened a case based on allegations the children had been neglected by their male childcare provider. The case review committee substantiated these allegations, noting: "The level of concern was significant due to the apparent strangeness/weirdness[] of the child care provider." After Julie's return from Iraq in January 2005, she defended her childcare provider and disputed the allegations. In November 2005, the children's school alleged Julie neglected the children because she was "never at home" "leaving the 11[-year-old] daughter to do much of the parenting." Although Army social services found this neglect allegation unsubstantiated in December 2005, the report noted Julie disclosed a history of excessive drinking, confirmed by collateral sources. The case review committee recommended psychiatric, substance abuse, and parenting treatment because it believed the children were at risk. Before enrolling in treatment, however, Julie was encouraged to develop a viable childcare plan. Julie chose as the children's care provider a male soldier who had alcohol and mental health issues serious enough to prompt a pending discharge from the Army. The cochair of the case review committee noted: "Prior to the scheduled start date of the inpatient treatment there was a significant physical altercation which the children witnessed and were involved in. The proposed caretaker was intoxicated, combative and verbally abusive to the children and their mother. A neighbor who attempted to intervene was injured to the extent where his leg was broken and he was hospitalized as a result."

On October 20, 2006, Julie filed an order to show cause (OSC) seeking under the Convention the return of her children to Germany, and requesting the court place the children in protective custody pending the hearing on the OSC. In her accompanying declaration, Julie accused Danny of violence toward the children and repeatedly beating her. She also accused Danny of having sex with other underage high school students, and sexually abusing a

daughter from a previous marriage. Julie declared that Danny had met his three previous wives while they were his high school students. Julie also alleged that she had spoken with Beth, Danny's daughter from a previous marriage, who claimed Danny had molested her and beaten her mother, Diane, and that she witnessed Danny having sex with high school students.

Danny filed a responsive declaration denying his previous wives were ever his students, that he ever beat any of his wives, including Julie, or that he was a sexual predator. Danny filed supporting declarations from Beth, who denied ever speaking with Julie or being sexually molested, and Diane, who denied she had been Danny's student or that she had been beaten by him.

In response to Julie's request, the Orange County Social Services Agency (SSA) placed the children in protective custody, but later released them to Danny. At the OSC hearing, the trial court granted Julie's Convention petition and ordered the children returned to Germany. The court also ruled that under the Uniform Child Custody Jurisdiction and Enforcement Act, Family Code section 3400 et seq., California was an inconvenient forum for adjudicating child custody. The court also assumed temporary emergency jurisdiction under Family Code section 3424, and removed the children from Danny's custody. The court determined the children were threatened with mistreatment or abuse in Danny's care due to the parents' extreme difference in age.

In the written findings of fact and conclusions of law (findings) prepared by Julie's attorneys, the court directed the children "be deposited and held in protective custody and placed at the discretion of the Director of the Department of Child Protective Services pending their return to Germany." At the conclusion of the findings, the order included a paragraph which read: "3. Until the time of the children's actual return, they shall be held in protective custody and placed according to the discretion of the Director of the Department of Child Protective Services." The court, however, lined out this paragraph, and either left in place or added the following paragraph: "5. As to California, Mother shall have exclusive custody of the children until their return to Germany and until such time that Germany Courts have accepted Jurisdiction to adjudicate any rights that Father may or may not have there." Danny now appeals this order.[6]

---

[6] Danny, however, did not turn the children over to Julie as required under the order, but delivered them into SSA's custody, which immediately initiated juvenile dependency proceedings.

## II

### Discussion

A. *The Trial Court Did Not Err in Finding Julie Established a Prima Facie Case for Return of the Children Under the Convention*

The trial court based its order in part on the Convention, as implemented by the International Child Abduction Remedies Act (ICARA), 42 United States Code sections 11601 through 11610. In an action under the Convention, we review the lower court's factual findings for clear error and its legal conclusions de novo. (See *Friedrich v. Friedrich* (6th Cir. 1996) 78 F.3d 1060, 1064.)

■ The Convention and ICARA seek " 'to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access.' [Citation.] Under Article 3 of the Convention, the removal or retention of a child is wrongful if: [¶] (a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and [¶] (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention. [¶] [Citation.] [Fn. omitted.]" (*Whallon v. Lynn* (1st Cir. 2000) 230 F.3d 450, 454 (*Whallon*).) The parent filing a Convention petition bears the burden of proving " 'wrongful removal' " by a preponderance of the evidence. (230 F.3d at p. 454; see 42 U.S.C. § 11603(e)(1).) "If the petitioner demonstrates that the child was wrongfully removed, the court must order the child's return to the country of habitual residence unless the respondent demonstrates that one of four narrow exceptions applies." (*Whallon*, at p. 454; see 42 U.S.C. § 11601(a)(4).)

The parties do not dispute the children's habitual residence is Germany, where they had lived continuously for over three and one-half years. Danny, however, contends his removal or retention of the children did not breach Julie's custodial rights under German law. In support, Danny notes that German law gives both parents equal de jure custody over a child. (See *Shealy v. Shealy* (10th Cir. 2002) 295 F.3d 1117, 1124; *Bader v. Kramer* (4th Cir. 2006) 445 F.3d 346, 350–351.) Danny reasons that because he had equal

custodial rights under German law, including the right to determine the children's residence, his removal or retention could not have been wrongful. Although Danny correctly cites German law, he misconstrues its effect under the Convention.

■ Under the Convention, one parent's removal or retention of a child may breach the second parent's custodial rights under the law of the children's habitual residence, even if such acts do not breach the law itself. As the explanatory report to the Convention instructs: "[F]rom the Convention's standpoint, *the removal of a child by one of the joint holders without the consent of the other, is wrongful, and this wrongfulness derives in this particular case, not from some action in breach of a particular law, but from the fact that such action has disregarded the rights of the other parent which are also protected by law, and has interfered with their normal exercise.* The Convention's true nature is revealed most clearly in these situations: it is not concerned with establishing the person to whom custody of the child will belong at some point in the future, nor with the situations in which it may prove necessary to modify a decision awarding joint custody on the basis of facts which have subsequently changed. *It seeks, more simply, to prevent a later decision on the matter being influenced by a change of circumstances brought about through unilateral action by one of the parties.*" (Pérez-Vera, Explanatory Rep. on 1980 Hague Child Abduction Convention, ¶ 71, pp. 447–448, reprinted in part in 51 Fed.Reg. 10494, italics added (Explanatory Report).)[7] Thus, Danny's removal or retention of the children is considered wrongful under the Convention even if Danny's actions did not violate German law. (See *Currier v. Currier* (D.N.H. 1994) 845 F.Supp. 916, 920–922.)

■ Danny contends that Julie was not actually exercising her rights of custody at the time of removal or retention because the Jugendamt had intervened to take physical custody of the children. Article 5a of the Convention states that the term " 'rights of custody,' " "shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence . . . ." The explanatory report notes that in determining whether a parent exercises rights of custody, " 'the law of the child's habitual residence is invoked in the widest possible sense,' and . . . the sources from which custody rights derive are 'all those upon which a claim can be based within the context of the legal system concerned.'

---

[7] "Elisa Perez-Vera served as 'the official Hague Conference reporter for the Convention,' and her explanatory report 'is recognized by the Conference as the official history of and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention.' [Citations.] 'Because a treaty ratified by the United States is not only the law of this land[] . . . but also an agreement among sovereign powers, we have traditionally considered as aids to its interpretation the negotiating and drafting history (travaux preparatoires) and the postratification understanding of the contracting parties.' [Citation.]" (*Whallon, supra*, 230 F.3d at p. 455, fn. 5.)

[Citation.] [Fn. omitted.] The Report also states that the Convention favors 'a flexible interpretation of the terms used, which allows the greatest possible number of cases to be brought into consideration.' [Citation.]" (*Whallon, supra,* 230 F.3d at p. 455.)

To determine whether Julie was exercising her rights of custody despite the Jugendamt's intervention, we consider the effect of that agency's actions upon Julie's rights under German law. In relevant part, section 42 of the German Social Code (Sozialgesetzbuch) (SGB), book VIII[8] authorizes the youth welfare office to take a child into its custody when there is an imminent danger to the well-being of the child, and (a) the person entitled to legal custody does not contest it, or (b) a family court decision cannot be obtained in a timely manner. (SGB VIII, § 42(1).) In caring for the child, the youth welfare office must take into consideration "the presumed will of the persons entitled to custody or the persons entitled to upbringing . . . . " (SGB VIII, § 42(2).) Once the child is in custody, "the Child Welfare Office shall immediately inform the persons entitled to custody or the persons entitled to the upbringing of the assumption of custody and shall assess with them the risks of endangerment. In the event that the persons entitled to custody or the persons entitled to upbringing contest the assumption of custody, then the Child Welfare Office shall immediately [¶] 1. return the child or young person to the persons entitled to custody or the persons entitled to upbringing if in the assessment of the Child Welfare Office, there is no threat to the well-being of the child or if the persons entitled to custody or the persons entitled to upbringing are willing and able to avert the threat, or [¶] 2. bring about a decision by the family court with regard to the necessary means for the well-being of the child or young person." (SGB VIII, § 42(3).)

Thus, under German law Julie retained substantial custodial rights after the Jugendamt's emergency seizure of her children, including the right to demand their immediate return and, if the children are not returned, to require the Jugendamt to obtain a court order. We conclude Julie continued to exercise "rights of custody" under the required "flexible interpretation" of that term. Julie has thus established a prima facie case for return under the Convention.

**B.** *The Trial Court Failed to Make Findings Regarding Convention, Article 13 Exceptions to Return*

**1.** *Physical or Psychological Harm/Intolerable Situation*

■ Once a petitioner under the Convention has demonstrated by a preponderance of the evidence that removal of a child was wrongful (see 42 U.S.C. § 11603(e)(1)), the other parent may assert exceptions that, if

---

[8] We grant Danny's request that we judicially notice relevant portions of the SGB.

proven, will prevent the return of the child. One exception to return exists when "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." (Convention, art. 13b.) This exception must be proved by clear and convincing evidence. (42 U.S.C. § 11603(e)(2)(B).)

Courts have construed the Convention's article 13b exception as " 'narrowly drawn.' " (*In re Application of Adan* (3d Cir. 2006) 437 F.3d 381, 395.) As the *Adan* court explains: " 'Were a court to give an overly broad construction to its authority to grant exceptions under the Convention, it would frustrate a paramount purpose of that international agreement— namely, to "preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court." ' [Citations.] As the U.S. State Department has explained, an ' "intolerable situation" was not intended to encompass return to a home where money is in short supply, or where educational or other opportunities are more limited than in the requested State. An example of an "intolerable situation" is one in which a custodial parent sexually abuses the child. If the other parent removes or retains the child to safeguard it against further victimization, and the abusive parent then petitions for the child's return under the Convention, the court may deny the petition. Such action would protect the child from being returned to an "intolerable situation" and subjected to a grave risk of psychological harm.' " (*Ibid.*)

Here, Danny contends Julie will place the children in an "intolerable situation" if she takes them back to Germany because the Jugendamt again will place the children in protective custody. Whether this would create an intolerable situation, however, is only part of the equation. Danny also provided evidence from Army and Jugendamt social workers detailing Julie's drunken, hostile, and suicidal acts shortly before and after Julie's children were taken from her, resulting in her involuntary commitment to a mental institution. This evidence, if accepted, would suffice to demonstrate a risk of harm to the children by clear and convincing evidence, even construing the exception narrowly. The trial court's order, however, sidestepped the issue: "There were allegations of Mother's misconduct raised in Germany. True or not true, this court has no jurisdiction to ascertain the reliability of those allegations."

■ Ironically, the trial court exercised emergency jurisdiction under Family Code section 3424 to remove the children from Danny, but refused to make any findings on the evidence demonstrating Julie posed a risk of potential harm to the children before awarding her custody. Contrary to its order, the trial court had jurisdiction to determine all of the issues raised by Julie's petition under the Convention, and erred by failing to fully consider the exceptions to return asserted by Danny and supported by the evidence.

■ We recognize courts should expeditiously determine Convention petitions. As one court explained: " 'There is no requirement under the Hague Convention or under the ICARA that discovery be allowed or that an evidentiary hearing be conducted. Thus, under the guidance of the Convention and the statutory scheme, the court is given the authority to resolve these cases without resorting to a full trial on the merits or a plenary evidentiary hearing.' " (*March v. Levine* (6th Cir. 2001) 249 F.3d 462, 474.) But this case does not present the typical Convention situation. Danny did not simply abduct the children, but took them at the request of the Jugendamt, who removed them from Julie out of concern for their safety. We therefore reverse the trial court's grant of Julie's Convention petition and remand for further findings to consider whether the children may suffer harm or be exposed to an intolerable situation if returned to Germany with their mother.

### 2. *Consent*

■ Another exception to return arises where "the person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention . . . ." (Convention, art. 13a.) This exception must be proved by a preponderance of the evidence. (42 U.S.C. § 11603(e)(2)(B).)

Danny submitted evidence that Julie agreed to have Danny take the children back to California. Specifically, Danny declared that Julie called Danny and told him he "needed to come over and get the children as they would not give them back to her and as she was restricted to barracks." In her petition, however, Julie stated that Danny took the children without her knowledge. Moreover, Julie conceded she had signed papers that apparently authorized removal of her children, but asserted she did so only under duress. On this latter issue, the trial court noted: "There were allegations of duress leading to Mother's agreement to place the children with their father. True or not true, all evidence to prove or disprove those assertions exits in the state of Germany." On remand, the trial court must determine whether Julie consented to the children's return.

### 3. *Potential Objections by the Children*

■ The Convention also provides one additional exception to return: "The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of majority at which it is appropriate to take account of its views." (Convention, art. 13.) The importance of this exception is explained in the Pérez-Vera report on the Convention: "[T]he Convention also provides

that *the child's views concerning the essential question of its return or retention may be conclusive,* provided it has, according to the competent authorities, attained an age and degree of maturity sufficient for its views to be taken into account. In this way, the Convention gives children the possibility of interpreting their own interests." (Pérez-Vera, Explanatory Rep., ¶ 30, p. 433, italics added.) "In applying the 'age and maturity' exception, a court must not focus solely on the general goal of the Convention—to protect children from the harmful effects of wrongful removal—but must also carefully determine that the particular child ' "has obtained an age and degree of maturity at which it is appropriate to take account of its views." ' " (*de Silva v. Pitts* (10th Cir. 2007) 481 F.3d 1279, 1286.)

The couple's older child is 13 years old, and the younger is now 11. Absent evidence to the contrary, the children's ages suggest they have the maturity to express their preferences. Indeed, school authorities in Germany alleged that Julie's malfeasance forced the daughter to assume the parenting role in the home. Thus, the circumstances suggest the court should, on remand, consider this potential exception to return.

C. *The Trial Court Abused Its Discretion in Awarding Emergency Custody of the Children to Julie Without Considering Whether Doing So Would Place the Children at Risk of Harm*

As noted above, the Army and German social service agencies removed the children from Julie's care due to concerns over her abuse of alcohol and mental health. These concerns are documented in letters and memoranda Danny included with his opposition papers. Given the evidence presented, we conclude the court abused its discretion by granting Julie emergency custody over the children without considering the evidence presented or making any finding whether doing so might potentially harm the children. Accordingly, we reverse the court's order. Because we reverse the trial court's order granting emergency custody to Julie under Family Code section 3424, we need not consider whether the trial court had jurisdiction to make a nonemergency custody determination under Family Code section 3421, or whether it abused its discretion in declaring California an inconvenient forum.

As a final matter, Julie requests we take judicial notice of the current juvenile proceedings involving the children. We do so, and observe that any further superior court proceedings regarding custody of the children on remand must await termination of the juvenile proceedings. (See Welf. & Inst. Code, § 304; *In re Marriage of Seaman & Menjou* (1991) 1 Cal.App.4th 1489, 1498–1499 [2 Cal.Rptr.2d 690]; Cal. Rules of Court, rules 5.510(c), 5.620(a).)

## III

### DISPOSITION

The order is reversed, and the cause remanded for further proceedings in accordance with this opinion. In the interests of justice, each party shall bear his or her own costs on this appeal.

O'Leary, Acting P. J., and Ikola, J., concurred.