Filed 1/14/16  Bounouar v. Fa'Alofa CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JOHAN BOUNOUAR,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ARY'EANNA FA'ALOFA,<br><br>    Defendant and Appellant. | D066948<br><br><br><br>(Super. Ct. No. D550998) |

APPEAL from an order of the Superior Court of San Diego County, David B. Oberholtzer, Judge.  Affirmed.

Ary'Eanna Fa'Alofa, in pro. per., for Defendant and Appellant.

Law Offices of Martin N. Buchanan and Martin N. Buchanan for Plaintiff and Respondent.

This case involves the Hague Convention on the Civil Aspects of International Child Abduction, October 25, 1980, T.I.A.S. No. 11670 (Hague Convention).  Under the Hague Convention, when a child under the age of 16 who was habitually residing in one

signatory state is wrongfully removed to another, the latter state shall "'order the return of the child forthwith.'"  (*Abbott v. Abbott* (2010) 560 U.S. 1, 9 (*Abbott*).)

Here, violating both a French court's *ne exeat* (no exit) order and Johan Bounouar's custody rights under French law, Ary'Eanna Fa'Alofa took their five-year old son, Bilal, from his habitual residence in France to the United States.  After conducting a hearing where Bounouar and Fa'Alofa testified, the court characterized this case as a "classic example of what the Hague Convention is designed to prevent" and ordered Bilal returned to France.

Self-represented, Fa'Alofa appeals, contending the order should be reversed because the court (1) did not provide her (a native English speaker) with a French interpreter; (2) withheld evidence of a December 2013 French court order giving Bounouar sole custody; (3) erroneously determined the parties' shared intent was to reside in France; (4) erroneously refused to consider the effects of a December 2013 "chasing order"; (5) denied her due process by conducting the hearing on inadequate notice and by denying her access to a lawyer; (6) allowed the district attorney to represent Bounouar; (7) ignored evidence of domestic violence; (8) failed to question Bounouar and relied on his false testimony; (9) erroneously determined Bounouar's custody rights; (10) neglected its "fiduciary duty" by not requiring Bounouar's personal appearance at a hearing on Fa'Alofa's motion for reconsideration; (11) erroneously determined the French court's *ne exeat* order afforded Bounouar custody rights; and (12) abused its discretion in ordering her to surrender Bilal's passport.

We affirm because many of Fa'Alofa's appellate arguments were forfeited by not being asserted in the trial court, and those that were asserted below lack merit.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Bounouar, Fa'Alofa, and Bilal—In San Diego*

Bounouar is a French citizen. He met Fa'Alofa while attending college in San Diego in 2008. After Fa'Alofa became pregnant with Bounouar's child, they were married in San Diego in 2009. Their son, Bilal, was born in San Diego in November 2009. Fa'Alofa also has a daughter, Kekoa, from a prior relationship.

B. *Bounouar Returns to France*

Twelve days after Bilal was born, Bounouar returned to France to find employment and housing for the family because his visa had been cancelled.[1] There, Bounouar enlisted in the French armed forces.

C. *Fa'Alofa and the Children Move to France*

In April 2011 when Bilal was 16 months old, Fa'Alofa moved to France with the children to live with Bounouar. Bounouar testified, "I love her at the time. I love her and I wanted her to come with the kids to make a family, to be a family." Fa'Alofa similarly testified she moved with Bilal and Kekoa to France for an indefinite time, stating:

> "Q: Why did you go to France in the first place with Kekoa and Bilal?
>
> "A: Because I wanted to be with Johan.

---

[1] Fa'Alofa gave conflicting testimony, stating that Bounouar left for France because of marital discord.

3

"Q: To be a family?

"A: Yeah."

Bounouar enlisted in the French armed forces for three years and planned to reenlist for two more. Fa'Alofa was "fine" with this arrangement and they lived together as a family in France for over two years. They enrolled Bilal in school for the 2013-2014 academic year.

D. *Marital Problems*

Fa'Alofa and Bounouar's marriage was marked with disagreements and difficulties. In August 2013 Fa'Alofa made a domestic violence report to French police. This concerned an incident where, according to Fa'Alofa, Bounouar barricaded her inside a room, grabbed her, and threw her to the ground. However, the prosecutor declined to file charges, finding the evidence insufficient. After this incident, the couple separated.

E. *French Court Issues Joint Custody and Ne Exeat Order*

In September 2013 Bounouar became concerned Fa'Alofa intended to take Bilal to the United States. Bounouar initiated proceedings in a French family law court, which conducted a hearing on the matter. Bounouar and Fa'Alofa testified.

Fa'Alofa told the court she had "no plan to leave France with her child" who had "recently entered in the kindergarten." Nevertheless, the French court issued a *ne exeat* order, directing that Bilal not be removed from France without permission of both parents. The court also found that under French law, Bounouar and Fa'Alofa "have joint parental authority over the child." Fa'Alofa did not appeal from this order.

4

F. *Fa'Alofa Abducts Bilal and Takes Him to San Diego*

After the September 2013 hearing, the parties had a physical altercation in a public park. Bounouar reported the incident to police. Bounouar and Fa'Alofa continued living apart, with Bilal living with each of them one week at a time.

In November 2013 Fa'Alofa left France with Bilal, taking him to San Diego without Bounouar's knowledge or permission. Fa'Alofa was also pregnant again, but she did not know whether Bounouar was the father.

Fa'Alofa admits she knowingly violated the French court's *ne exeat* order by taking Bilal from France:

> "The Court: [T]he order was that you were not to remove Bilal from French territory without the consent of both parents. Did you understand you were violating that court order when you left?"
>
> "Fa'Alofa: Yeah."

G. *Hague Convention Hearing*

Within two weeks after Fa'Alofa took Bilal from France, Bounouar submitted a Hague Convention application seeking Bilal's return to France. Ten months later, on September 10, 2014, the San Diego County District Attorney's Office filed a "Petition for the Return of the Child Under the Hague Convention . . . ." Two days later, the court conducted a hearing, where both Bounouar and Fa'Alofa were self-represented and testified. The court also received documentary evidence.

Before hearing any testimony, the court addressed Fa'Alofa, stating, "I don't have your side of the story. All I've got is what was put into the record by the father in France and was transmitted to us. So I want to make sure that you get an opportunity to tell me

5

your side of the story, as well. We will start with a[n] outline of the facts from the district attorney, and then I will—I'll be asking questions, perhaps of her, perhaps of the investigators, and then of course of you. Okay, is there anything you don't understand about what's—what we're doing here?" Fa'Alofa had no questions, and did not ask for a continuance or additional time to consult a lawyer.

After the district attorney summarized the evidence, Fa'Alofa and Bounouar both testified in narrative form, with the court at times asking each questions. Then, the deputy district attorney asked Fa'Alofa questions to determine whether a wrongful taking occurred under the Hague Convention.

The deputy district attorney asked Fa'Alofa questions about the parties' shared intent to reside in France:

> "Q: Why did you go to France in the first place with Kekoa and Bilal?
>
> "A: Because I wanted to be with Johan [Bounouar].
>
> "Q: To be a family?
>
> "A: Yeah.
>
> "Q: And how long were you planning to live there?
>
> "A: We hadn't really planned much of anything. It just kind of is touch and go.
>
> "Q: So it wasn't a: We'll try this for a certain period of time and see and then I'll move back if I don't like it? It wasn't like that?
>
> "A: No. He signed his contract for the military for three years and planned to sign up for two more for the five. So it wasn't planned. It was just this is what we're doing and this is what I have and this is the best way to support the family and so that was—that was that.

6

"Q: And you were—you were fine with that at the time when you went there?

"A: Yeah. I stayed there for almost four years."

Next, the deputy district attorney asked Fa'Alofa whether she was concerned about Bilal's safety if he was returned to France to live with Bounouar:

"Q: [D]o you have any concerns for Bilal's safety were he to be living in France with Mr. Bounouar?

"A: My only concern is the fact that he is not an only child. Him and his sister are almost inseparable, the two of them."[2]

At the conclusion of the hearing, the court found France was the country of Bilal's habitual residence because Bilal was in France "as part of a family unit. He was attending school. There was no present intent to leave. He was essentially a resident of France." The court also found France was Bilal's habitual residence because Bounouar and Fa'Alofa intended to make France their home.

The court found the French court "unquestionably had jurisdiction to determine custody," its order was "not one-sided" but rather "reasonable" and gave "both parents equal [custody] rights." The court found Bounouar was exercising his custody rights

---

[2] For the first time in her reply brief, Fa'Alofa contends she was "caught off guard" by this question and she is "now formally expressing these concerns" about Bilal's safety. However, even in her motion for reconsideration, filed by *counsel*, Fa'Alofa made no such assertions. Fa'Alofa's attempt to reopen the evidentiary hearing now and contradict her testimony, for the first time in a reply brief, is improper and we do not consider such assertions. (*Knapp v. City of Newport Beach* (1960) 186 Cal.App.2d 669, 679 [statements of alleged fact in the briefs on appeal that are not contained in the record will be disregarded by the court of appeal].)

when Fa'Alofa removed Bilal from France and that Fa'Alofa's removal of Bilal from France was wrongful under both the *ne exeat* order and Bounouar's custody rights under French law.

The court also found "there's no issue here that the mother or the child is unsafe in France or that the French courts are not competent to make this determination. So if the events that she described are true and if they should be taken into consideration with respect to the custody of Bilal, that decision has to be made by the French family court, not this one." The court ordered "that the child be repatriated and returned to France with the father."

The deputy district attorney told the court, "Mr. Bounouar is prepared to take Bilal back to France with him when he leaves." The court issued an order directing that Bilal "shall be returned to France with [Bounouar] forthwith, pursuant to Article 12 of the Hague Convention."

After the hearing, Fa'Alofa hired an attorney, who filed a request for reconsideration and modification of return order. After conducting a hearing, the court modified the order to give Fa'Alofa weekly Skype contact with Bilal. This appeal followed.

DISCUSSION

I. *THE HAGUE CONVENTION GENERALLY*

"The Hague Convention seeks to deter parents from abducting their children across national borders by limiting the main incentive for international abduction—the forum shopping of custody disputes." (*Cuellar v. Joyce* (9th Cir. 2010) 596 F.3d 505,

8

508.)  "A court that receives a petition under the Hague Convention may not resolve the question of who, as between the parents, is best suited to have custody of the child.  [Citation].  With a few narrow exceptions, the court must return the abducted child to its country of habitual residence so that the courts of *that* country can determine custody."  (*Ibid.*)  "The principal aims of the [Hague] Convention are to 'prevent an international version of forum-shopping,' 'defeat attempts to re-litigate custody matters, [citation],' and 'facilitate custody adjudications, promptly and exclusively' in the child's country of residence."  (*West v. Dobrev* (10th Cir. 2013) 735 F.3d 921, 929, italics omitted.)

Thus, a Hague Convention case is more akin to a provisional remedy—to determine if the child was wrongfully removed from his or her habitual residence, and if so, then to order the child to be returned to that nation.  The merits of the child custody case—what a parent's custody and visitation rights should be—are questions reserved for the courts of the habitual residence.  "Thus the issue of which placement is better for the child in the long run is irrelevant."  (*In re Marriage of Forrest & Eaddy* (2006) 144 Cal.App.4th 1202, 1210 (*Eaddy*).)

A parent petitioning for the return of a child must show by a preponderance of evidence that:  (1) a child under the age of 16; (2) has been wrongfully removed or retained; (3) from his or her habitual residence; (4) in violation of the custody rights of the left-behind parent.  (Garbolino, Federal Judicial Center, International Litigation Guide (2012) The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges, FJC-MISC-2012-9, at p. 6.)  If the parent petitioning for

return of the child has proved these elements, the court must order return of the child, unless one of the defenses to return is established.

Under article 3 of the Hague Convention, the removal of a child is wrongful "where it breaches the petitioner's rights of custody, providing that the petitioner was exercising those rights" at the time of the removal. (*Eaddy*, *supra,* 144 Cal.App.4th at p. 1211.) A *ne exeat* right granted by a foreign court (i.e., an order requiring both parents to consent to removing the child) itself confers a "'right[] of custody'" under the Hague Convention. (*Abbott, supra,* 560 U.S. at p. 10.)

Removing a child without the other parent's consent is wrongful under the Hague Convention, even when both parents have equal custodial rights under the law of the child's habitual residence. From the Hague Convention's standpoint, the wrongfulness derives from the fact such action has disregarded the rights of the other parent that are also protected by law. (*In re Marriage of Witherspoon* (2007) 155 Cal.App.4th 963, 972 (*Witherspoon*).)

To invoke the Hague Convention, the removal of the child must have occurred from the place of his or her "habitual residence." (*Witherspoon, supra,* 155 Cal.App.4th at p. 971.) "The Convention does not define the term 'habitual residence,' although the cases interpreting it have concluded that the term refers to the child's customary residence prior to the wrongful removal or retention." (*Eaddy*, *supra*, 144 Cal.App.4th at p. 1213.) The parents' "last shared intent as to the child's residence is frequently determinative" where that intent "has been carried out for an appreciable period of time." (*Ibid.*)

10

A petitioner under the Hague Convention "bears the burden of proving the child's wrongful removal or retention by a preponderance of the evidence." (*Eaddy*, *supra*, 144 Cal.App.4th at p. 1211.) "If the petitioner succeeds in showing a wrongful removal, the [Hague Convention] requires repatriation of the abducted child to its country of habitual residence in all but a few exceptional circumstances. [Citations.] Exceptions to the Hague Convention must be narrowly interpreted 'lest they swallow the rule of return.' " (*Maurizio R. v. L.C.* (2011) 201 Cal.App.4th 616, 633 (*Maurizio R.*).)

One such exception is the "grave risk" exception, which provides that return of a child to his or her country of habitual residence need not be ordered if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." (Hague Convention, art. 13, par. b; 22 U.S.C. § 9003(e)(2)(A).) The grave risk exception is narrow and must be proved by clear and convincing evidence. (22 U.S.C. § 9003(e)(2)(A); *Maurizio R., supra,* 201 Cal.App.4th at p. 633; *Witherspoon, supra,* 155 Cal.App.4th at p. 974.)

## II. *THE STANDARD OF REVIEW*

On appeal from an order granting or denying a Hague Convention petition, "we review the trial court's determination of the historical facts for substantial evidence but conduct a de novo review of the questions of law." (*Eaddy*, *supra*, 144 Cal.App.4th at p. 1213.) We review independently a trial court's interpretation of the Hague Convention and its application of the Hague Convention to the facts in a particular case. (*Maurizio R.*, *supra*, 201 Cal.App.4th at pp. 633-634.)

11

### III. *FA'ALOFA HAS NOT DEMONSTRATED ANY REVERSIBLE ERROR*

#### A. *No Interpreter*

Fa'Alofa complains there was no French interpreter at the hearing. However, Fa'Alofa speaks English and the hearing was conducted in English. Although some of the documentary evidence is written in French, in the trial court Fa'Alofa never requested an interpreter and never asked that any French documents be translated into English. As a result, she has forfeited any claim of error on this ground. "Contentions or theories raised for the first time on appeal are not entitled to consideration." (*City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 685.) "It must appear from the record that the issue argued on appeal was raised in the trial court. If not, the issue is waived." (*Amato v. Mercury Casualty Co.* (1993) 18 Cal.App.4th 1784, 1794.)

Moreover, even if Fa'Alofa had not forfeited this issue, her argument is unavailing because she does not identify any particular French document which, untranslated, deprived the court of relevant evidence. The record contains many documents translated from French to English including: (1) Request for the Return of An Abducted Child, Pursuant to the Hague Convention; (2) Excerpts from the French Civil Code regarding parental custody rights; and (3) French court order, September 24, 2013, providing for joint custody and *ne exeat*. Fa'Alofa's August 2013 police report of alleged domestic violence is in French and was not translated into English. However, at the hearing, Fa'Alofa testified about the underlying incident, her report to the police, and the police response. Thus, any error in not translating the same information contained in the French

12

police report would be harmless because the same information was received through Fa'Alofa's testimony.

B. *Withheld Evidence and Chasing Order*

When a left-behind parent applies for custody after the other parent has taken the child out of the country, the subsequent custody order is sometimes referred to as a "chasing order."  (See *Slight v. Noonkester* (D.Mont., Jan. 24, 2014, No. CV 13-158-BLG-SPW) 2014 U.S.Dist. Lexis 9133 at *14.)  On December 24, 2013—approximately one month after Fa'Alofa left France with Bilal—a French court entered such an order, awarding Bounouar sole custody of Bilal.

At the beginning of the hearing here, the deputy district attorney explained, "We have just recently learned that apparently on December 24th of 2013, the court in Gap, France, did make a custody order saying that Bilal should reside with his father. Unfortunately, we do not have a translated copy of that.  We have a copy in French, but we just received it yesterday so did not have a chance to have it translated for the court and the parties."

On appeal, Fa'Alofa contends the court wrongly "withheld" this December 2013 order from her and, as a result, deprived her of due process and a "fair trial."  However, Fa'Alofa does not explain how having an English version of this December 2013 order would have been relevant.  Fa'Alofa submitted a partial English translation of this order with her motion for reconsideration, and it says exactly what the deputy district attorney represented at the hearing.

13

Moreover, there was no need to translate this December 2013 French order into English because it is irrelevant. Custody rights under the Hague Convention are determined as of the time of removal, not afterwards. (*White v. White* (4th Cir. 2013) 718 F.3d 300, 306-307.) Here, the court properly did not cite or rely on the December 2013 order in either its decision from the bench or in its subsequent written order granting the Hague Convention petition.

Fa'Alofa also contends that because the chasing order awards Bounouar custody of Bilal after she abducted him to the United States, then necessarily Bounouar lacked the requisite custody rights at the time of the removal. Fa'Alofa's argument fails, however, because Bounouar did not need sole custody of Bilal to compel his return to France under the Hague Convention.

By order dated September 24, 2013—*before* Fa'Alofa abducted Bilal—the French court awarded Bounouar joint custody. Bounouar did not need sole custody of Bilal to make Fa'Alofa's removal wrongful under the Hague Convention. A removal of the child without the other parent's consent is wrongful under the Hague Convention even where both parents have equal custodial rights:

> "'[F]rom the Convention's standpoint, the removal of a child by one of the joint holders without the consent of the other, is wrongful, and this wrongfulness derives in this particular case, not from some action in breach of a particular law, but from the fact that such action has disregarded the rights of the other parent which are also protected by law, and has interfered with their normal exercise. The Convention's true nature is revealed most clearly in these situations: it is not concerned with establishing the person to whom custody of the child will belong at some point in the future, nor with the situations in which it may prove necessary to modify a decision awarding joint custody on the basis of facts which have subsequently

14

changed. It seeks, more simply, to prevent a later decision on the matter being influenced by a change of circumstances brought about through unilateral action by one of the parties.'" (*Witherspoon, supra,* 155 Cal.App.4th at p. 972, italics omitted.)

C. *Substantial Evidence of Shared Intent*

To invoke the Hague Convention, removal of the child must have occurred from the place of his or her habitual residence. (*Eaddy*, *supra*, 144 Cal.App.4th at p. 1213.) The Hague Convention "does not define 'habitual residence,' although the cases interpreting it have concluded that the term refers to the child's customary residence prior to the wrongful removal . . . ." (*Ibid.*) Where, as here, the child is too young to make an independent decision about living arrangements, "the parents' last shared intent as to the child's residence is frequently determinative, provided that that intent has been carried out of an appreciable period of time." (*Ibid.*)

Fa'Alofa testified that when Bilal was 16-months old, she moved to France with Bilal to live with Bounouar as a "family" for an indefinite time. She and Bounouar enrolled Bilal in school, which he attended until Fa'Alofa abducted him. Based on this evidence, the court determined the parents' last shared intent was to live in France. Additionally, the court found there was "no present intent to leave. He [Bilal] was essentially a resident of France."

Fa'Alofa asserts that "[w]hen Johan [Bounouar] didn't help me to get a green card to stay in France any shared intent was legally over for me as of April of 2012 when my visa expired after [one year] of being in France." We construe this as an attack on the sufficiency of the evidence to support the finding of habitual residence in France. We

15

reject Fa'Alofa's assertion because Fa'Alofa in fact remained in France until November 2013— more than 19 months after she claims she formed the unexpressed subjective intent to leave. Thus, the court reasonably could disbelieve her contrary testimony about her subjective intent. Moreover, even under Fa'Alofa's version of events, the parties' last shared intent was to live in France together as a family, and that shared intent had already "been carried out for an appreciable period of time" from April 2011 to April 2012, before Fa'Alofa claims it ended. (*Eaddy*, *supra*, 144 Cal.App.4th at p. 1213.)

D. *Inadequate Notice and Opportunity to Defend*

Without citation to the record, Fa'Alofa asserts she was served with the summons and a "packet of discovery" at 8:30 a.m. on the day of the hearing, requiring her attendance less than two hours later for the hearing. She contends the order must be reversed because she lacked adequate notice to prepare for the hearing or retain an attorney.

The record does not contain any proof of service to indicate when Fa'Alofa received notice of the hearing date and time. As appellant, it is Fa'Alofa's burden to provide an adequate record to demonstrate error. (*Gee v. American Realty & Construction, Inc.* (2002) 99 Cal.App.4th 1412, 1416.)

However, the record does show that *at most*, she could not have had more than two days' notice: The petition for the return of the child under the Hague Convention was filed on September 10, 2014, and the hearing occurred on September 12, 2014.

In the United States, the Hague Convention is implemented by the International Child Abduction Remedies Act (ICARA), 22 United States Code section 9001 et seq.

16

Under ICARA, "Notice of an action . . . shall be given in accordance with the applicable law governing notice in interstate child custody proceedings." (22 U.S.C. § 9003(c).)

In California, notice in interstate child custody proceedings is governed by Family Code sections 3408 and 3425, which require the parties be given "reasonable notice and an opportunity to be heard" before the court makes its order. (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2015) ¶ 7:659.2, p. 7-311.)[3]

A Hague Convention hearing is an emergency proceeding that requires "'the most expeditious procedures available'" (*March v. Levine* (6th Cir. 2001) 249 F.3d 462, 474) for the "prompt" return of wrongfully removed children. (*Id.* at p. 465.) The Hague Convention's "'nature is one of emergency because it seeks a speedy and immediate solution to the cases involved.'" (*Id.* at p. 474.)

Accordingly, "[w]hen a party in a Hague Convention proceeding believes he or she has not been given sufficient time to prepare opposition, it is *critical* to object to the date set for hearing . . . and *request a continuance on the record* in order to preserve a claim of insufficient notice or denial of a fair hearing for appellate review." (Hogoboom & King, Cal. Practice Guide: Family Law, *supra,* ¶ 7:659.3, p. 7-311, citing *Wipranik v. Superior Court* (1998) 63 Cal.App.4th 315 (*Wipranik*), italics added.)

---

3    For the first time in her reply brief, Fa'Alofa contends notice here is governed by Family Code section 3448, subdivision (c), which provides for a hearing on an enforcement of judgment proceeding "on the next judicial day." However, arguments raised for the first time in an appellant's reply brief are forfeited unless good reason has been shown for failure to raise them. (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 482, fn. 10.) Fa'Alofa makes no such showing. This rule exists because arguments made for the first time in a reply brief deprive the respondent of an opportunity to counter the argument. (*American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453.)

*Wipranik, supra*, 63 Cal.App.4th 315 is instructive.  There, a party was given 10 days to prepare for the Hague Convention hearing.  (*Id*. at p. 322.)  On appeal, she asserted this was an insufficient amount of time.  The *Wipranik* court rejected this contention because "at no time during the hearing" did her lawyer object to improper notice, request a continuance, or request additional time to present evidence.  (*Id.* at pp. 322-323.)

The purpose of this forfeiture rule is to encourage parties to bring any errors to the trial court's attention so the court may correct or avoid the errors and provide a fair trial.  """"No procedural principle is more familiar to this Court than that a *constitutional* right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.""""  (*Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 264, italics added by *Keener*.)  """""The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them.  If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal.""""  (*Id*. at pp. 264-265.)

We are concerned the hearing in this case occurred on only two days' notice.  However, although not cited by the parties, we have found one case where a Hague Convention hearing occurred within two days of service of the petition.  (*Antonio v. Bello* (N.D. Ga., June 7, 2004, Civ. A. No. 1:04-CV-1555-TWT) 2004 U.S.Dist. Lexis 17255 [Hague Convention petition filed May 28, 2004; ex parte hearing directing U.S. Marshals

18

to take custody of the child on June 1, 2004; respondent served on June 2, 2004 and hearing occurred on June 4, 2004].) There are other cases with Hague Convention hearings occurring between eight and 30 days after service of the petition. (See, e.g., *Zajaczkowski v. Zajaczkowska* (D.Md. 1996) 932 F.Supp. 128, 130 [collecting cases, noting expedited nature of Hague Convention proceedings resulted in one case heard within 30 days and another eight days after the petition was filed].)

Here, Fa'Alofa did not object to improper or inadequate notice, request a continuance, or request additional time to present evidence or consult with or hire an attorney. Moreover, before the hearing began, the court told Fa'Alofa, "I want to make sure that you get an opportunity to tell me your side of the story, as well. We will start with an outline of the facts from the district attorney, and then I will— I'll be asking questions, perhaps of her, perhaps of the investigators, and then of course, of you. Okay, is there anything you don't understand about what's—what we're doing here?" In response to the court's invitation to express concerns or question about "anything you don't understand," Fa'Alofa was silent. As a result, she and Bounouar were sworn in to testify and the hearing began.

Under these circumstances, had Fa'Alofa been represented by an attorney, we would find any appellate contention about inadequate notice to have been forfeited. (*Wipranik, supra*, 63 Cal.App.4th at pp. 322-323.) A party cannot complain on appeal about not receiving a continuance she never requested in the trial court. (See *In re Etherington* (1950) 35 Cal.2d 863, 867 [mother waived any objection to lack of statutory

notice of a hearing; after court granted a one-day continuance, mother did not object to notice or request a further continuance].)

Fa'Alofa's status as a self-represented litigant does not relieve her of the same requirement to object or request a continuance under these circumstances. Self-represented litigants are "held to the same standards as attorneys." (*Kobayashi v. Superior Court* (2009) 175 Cal.App.4th 536, 543.) "A doctrine generally requiring or permitting exceptional treatment of parties who represent themselves would lead to a quagmire in the trial courts, and would be unfair to the other parties to litigation." (*Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 985 .) Moreover, Fa'Alofa's self-represented status imposed no duty on the trial court, on its own initiative, to inquire how much time Fa'Alofa needed and then grant a continuance. Self-representation does not entitle a litigant to special treatment. (*Id*. at pp. 984-985.)

E. *The Deputy District Attorney's Role*

Fa'Alofa asserts the deputy district attorney improperly assumed the role of representing Bounouar at the hearing. However, the deputy district attorney did not represent either party; she was acting as a friend of the court as expressly authorized by Family Code section 3455 which provides:

> "(a) In a case arising under this part or involving the Hague Convention on the Civil Aspects of International Child Abduction, a district attorney is authorized to proceed pursuant to Chapter 8 (commencing with Section 3130) of Part 2.
>
> "(b) A district attorney acting under this section acts on behalf of the court and may not represent any party."

20

When the hearing began, the deputy district attorney announced her appearance, stating, "Deputy District Attorney Jill Lindberg appearing as a friend of the court." As such, her role was to ensure all relevant evidence and argument was before the court so the court could make an appropriate decision. The fact such evidence favored granting the Hague Convention petition does not make the deputy district attorney Bounouar's advocate. "[A]n amicus who makes a strong but responsible presentation in support of a party can truly serve as the court's friend." (*Neonatology Assocs., P.A. v. Comm'r* (3d Cir. 2002) 293 F.3d 128, 131.)

The court allowed both Fa'Alofa and Bounouar to testify in narrative. After each testified in this manner, the deputy district attorney asked Fa'alofa questions designed to elicit evidence either establishing or refuting the essential elements of the Hague Convention petition. These questions included, "Why did you go to France in the first place with Kekoa and Bilal," which addresses the issue of habitual residence and last shared intent. The deputy district attorney also asked Fa'Alofa, "[D]o you have any concerns for Bilal's safety were he to be living in France with Mr. Bounouar," which addressed the defense of grave risk of harm.

Significantly, the deputy district attorney did not ask leading questions. The open-ended questions were fair and had pinpoint relevance to the disputed issues in the case. The questions were calculated to, and did, assist the court in fulfilling its obligation to determine whether the petition's allegations were supported by the evidence.

F. *Domestic Violence*

Fa'Alofa contends Bounouar assaulted her during the marriage and she had to flee the family home. Although she cites no legal authority and the argument is not well developed, she contends the court here erred because Hague Convention "takes into account the issue of domestic violence, as the reason for a mother leaving a relationship, or the foreign country she resided in at the time of abuse."

However, even if everything Fa'Alofa testified about is true (and Bounouar disputed it, testifying Fa'Alofa was lying), there is no evidence of any harm to Bilal. Fa'Alofa herself testified that she had no concerns about Bilal's safety if he was returned to France to live with Bounouar. Her only concern was that Bilal would miss being with his sister.

To the extent Fa'Alofa's argument is really that the court erred in determining Bilal would not be subjected to a grave risk of harm upon his return to France, the law does not support her contention. The "grave risk of harm" defense is narrowly drawn. (*Eaddy*, *supra,* 144 Cal.App.4th at p. 1211.) By grave harm the Hague Convention contemplates an intolerable situation where there is clear and convincing evidence the child would suffer "'serious abuse'" as a result of being returned. (*Ibid.*) Here, the trial court properly concluded that even if everything Fa'Alofa testified about is true, "there's no issue here that the mother or the child is unsafe in France or that the French courts are not competent to make this determination. So if the events she described are true and if they should be taken into consideration with the—with respect to the custody of Bilal, that decision has to be made by the French family court, not this one."

22

To the extent Fa'Alofa's argument is the French legal system is "too corrupt" to fairly decide custody, that too is not a "grave risk of harm" within the meaning of the Hague Convention. "Once the child is born, the remote parent must accept the country where the child is habitually resident and its legal system as given." (*Cuellar v. Joyce*, *supra*, 596 F.3d at p. 510.)

G. "*No Fair Trial*"

Fa'Alofa argues the court did not devote sufficient time to the hearing and should have questioned Bounouar instead of allowing a "one sided case" to be presented. However, when the hearing started, the court told Fa'Alofa, "I want to make sure you get an opportunity to tell me your side of the story." After approximately 90 minutes of testimony, the court asked Fa'Alofa if she would like to submit "anything else." Fa'Alofa replied, "No." Having told the court she had no additional evidence to submit, Fa'Alofa has forfeited any claim on appeal that the hearing unfairly deprived her of an opportunity to present her case.

For the first time in her reply brief, Fa'Alofa contends that if she had been allowed more time, she would have submitted an e-mail from Bounouar evidencing his "anger issues." She also contends in her reply brief that she "brought evidence, for the court to examine . . . but it was not . . . entered into the record . . . ." Additionally, her reply brief asserts that although the court ordered Skype visits, Bounouar has "not followed the order."

We do not consider arguments made for the first time in a reply brief unless good cause is shown for the failure to raise them in the opening brief. This rule is necessary

23

because such arguments deprive the respondent of an opportunity to counter the argument. (*American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453.)

Moreover, the court did question Bounouar; the hearing was not one-sided. The court asked Bounouar questions about the decision to relocate to France, telephone conversations with Fa'Alofa, and her access to his computer. The court expressed skepticism about certain documentary evidence Bounouar submitted.

In a related argument, Fa'Alofa contends the court should have been required to question Bounouar about who would care for Bilal, and "how stable his life would be" once Bilal returned to France. However, this argument misconceives the nature of the Hague Convention proceeding. The sole function of an action under the Hague Convention is to determine if the abducted child should be returned to the country of habitual residence. The action does not govern the merits of custody disputes; those issues must be decided in the county of habitual residence. (*Eaddy*, *supra,* 144 Cal.App.4th at p. 1211.) The issue of "who is the better parent in the long run" is not relevant here. (*Nunez-Escudero v. Tice-Menley* (8th Cir. 1995) 58 F.3d 374, 377.) The court's concern is determining the country that is the center of the child's life. Once established, the court "shall act expeditiously" to return the child to that country for custody proceedings under its domestic law. (*Papakosmas v. Papakosmas* (9th Cir. 2007) 483 F.3d 617, 621, fn. 2.)

H. *Fraudulent Claims*

Fa'Alofa asserts Bounouar "presented fraudulent information that I had committed some act of assault against him on September 9th or 10th." However, this alleged

incident had nothing to do with the essential issues to be determined, namely: (1) Bilal's country of habitual residence; (2) Fa'Alofa's wrongful removal of Bilal; (3) Bounouar's exercise of custody rights at the time of removal; and (4) the absence of grave risk of harm to Bilal. Accordingly, the trial court properly did not rely on this disputed issue in either its oral statement at the end of the hearing or in its written order. The incident provided background information about marital strife and nothing more.

### I. *Bounouar Was Exercising Custody Rights*

Removal of a child from the country of habitual residence cannot be "wrongful" under the Hague Convention unless the petitioning parent was exercising lawful custody rights to the child at the time of the removal. (*Eaddy*, *supra*, 144 Cal.App.4th at p. 1211.) Whether the parent was exercising lawful custody rights is determined under the law of the child's habitual residence. (*Witherspoon*, *supra,* 155 Cal.App.4th at p. 971.) "The standard for finding that a parent was exercising his custody rights is a liberal one, and courts will generally find exercise whenever 'a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child.'" (*Walker v. Walker* (7th Cir. 2012) 701 F.3d 1110, 1121.)

Fa'Alofa contends Bounouar was not exercising custody rights at the time of the removal. However, the record supports the court's finding that Bounouar was exercising custody rights. The court found, "They had been living together as a family, and then he [Bounouar] had Bilal every other week in his care and custody two months prior to his trip to the United States. He did not acquiesce in the removal and filed Hague [proceedings] within two weeks of when the child had been removed from France."

25

Fa'Alofa herself testified that in October and November 2013, while they were living separately, she and Bounouar were sharing custody of Bilal "the week on, week off."

J.  "*The French Court Did Nothing*"

Fa'Alofa asserts the court conducted "no review of the French court . . . to see if this foreign country gave me an opportunity to receive a fair trial or due process . . . ." Fa'Alofa's assertion is incorrect.  The court reviewed the French court's joint custody order, and determined the order was appropriate and fair, stating:

> "The orders that were issued by the French court are not, shall I say, particularly onerous.  They are the same—the same orders that we would issue here, which is to say that the parents are to cooperate with one another over sharing the child, that neither parent can remove the child without the other parent's consent.  [¶] If it were here in this court, the order would be that the child cannot be removed from San Diego County without the other parent's consent.  [¶] So that's an altogether common order and appropriate.  [¶] I know that [Fa'Alofa] has complained that the order in the French court [was] one-sided.  [¶] I wasn't there.  I don't know what was said and how it was done.  [¶] I do know that the order that the French court issued is not one-sided.  The order is reasonable and gives both parents equal rights."

K.  *Bounouar's Return to France with Bilal*

Fa'Alofa asserts the court "neglected his fiduciary duty" by allowing Bounouar to return to France with Bilal immediately after the hearing.  However, Fa'Alofa cites no authority for the proposition a court owes any fiduciary duty to any litigant.  Moreover, the court's order expressly provides, "the child be repatriated and returned to France with the father."  The same date, the court issued a written order directing that Bilal "shall be returned to France with [Bounouar] forthwith, pursuant to Article 12 of the Hague Convention."

26

L. *Ne Exeat Order*

Citing *Croll v. Croll* (2d Cir. 2000) 229 F.3d 133, *Fawcett v. McRoberts* (4th Cir. 2003) 326 F.3d 491; *Gonzalez v. Gutierrez* (9th Cir. 2002) 311 F.3d 942, and *Abbott v. Abbott* (5th Cir. 2008) 542 F.3d 1081, Fa'Alofa contends the French court's *ne exeat* order is not a child custody order. Based on these cases, in her reply brief Fa'Alofa asserts Bounouar had no custody rights.

This contention fails for two reasons. First, the cases Fa'Alofa cites were abrogated approximately five years ago by the United States Supreme Court in *Abbott, supra,* 560 U.S. at page 7. Contrary to her assertions, a *ne exeat* right granted by a foreign court itself confers "a right of custody" under the Hague Convention. (*Abbott, supra,* 560 U.S. at p. 7.) Second, entirely independent of the *ne exeat* order, Bounouar had joint custody rights under French law as decreed by the French court it its September 24, 2013 order.

M. *No Abuse of Discretion in Requiring Surrender of Passports*

Fa'Alofa contends the court abused its discretion by forcing her to surrender Bilal's passport so he could return to France with Bounouar. However, "The Hague Convention and its implementing statute authorize the granting of this relief." (*Axford v. Axford* (E.D. Pa., July 10, 2009, Civ. A. No. 09-2914) 2009 U.S.Dist. Lexis 65333 at *13 [child's passport ordered to be surrendered].)

DISPOSITION

The order is affirmed.  Each party to bear its own costs on appeal.


NARES, Acting P. J.

WE CONCUR:


O'ROURKE, J.


IRION, J.